NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 15

No. 2014-455

| | |
|---|---|
| Brisson Stone LLC, Allan Brisson and Michael Brisson | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, |
| | Environmental Division |
| | |
| Town of Monkton and Claudia Orlandi | September Term, 2015 |

Thomas G. Walsh, J.

Colin R. Hagan and David J. Shlansky of Champlain Law Group, PLC, Vergennes, for
  Appellants.

Liam L. Murphy of Murphy Sullivan Kronk, Burlington, for Appellee.

James A. Dumont of Law Office of James A. Dumont, P.C., Bristol, for Intervenor-Appellee
  Orlandi.


PRESENT:  Skoglund, Robinson and Eaton, JJ., and Morse (Ret.) and Burgess (Ret.), JJ.,
          Specially Assigned


¶ 1.   **SKOGLUND, J.**   In this combined appeal, applicants—Allen Brisson, Michael Brisson, and Brisson Stone, LLC—claim that their application for a commercial gravel extraction permit is allowed under the Town of Monkton's zoning regulations and that their application should have been deemed approved under 24 V.S.A. § 4464(b)(1). We affirm the Environmental Division's denial of the application on the merits and hold that, even if the application was deemed approved, the deemed approval remedy would not foreclose an interested party's timely appeal to the Environmental Division on the permit's merits.

¶ 2.    Allen and Michael Brisson leased part of their 324-acre parcel in Monkton to Brisson Stone, LLC, to operate a quarry.  Applicants then submitted an application for a "gravel extraction operation" to Monkton's zoning administrator.  The applicants' proposed site did not have alluvial deposits; that is, no naturally occurring gravel beds appeared to be on the site.  Instead, the suggested location contained ledge rock.  Applicants planned to drill and blast ledge rock to produce unconsolidated rock and gravel.  After blasting, appropriately sized gravel would be stockpiled for sale.  Any non-saleable rock pieces would be processed on-site using sorting equipment, such as a portable rock crusher and screener.  The applicants believed Monkton's zoning regulations permitted a proposed gravel operation like theirs that would "remove rock and stone material from the earth using drilling and blasting, such as quarries."

¶ 3.    The zoning administrator referred the permit application to Monkton's Developmental Review Board (DRB) in January 2012.[1]  Claudia Orlandi, an adjoining landowner, participated before the DRB as an interested person pursuant to 24 V.S.A. § 4471.

¶ 4.    From the outset, the DRB identified a problematic issue with the application: it was unclear if the applicant's proposed project of blasting, drilling, and crushing ledge rock was a gravel extraction operation permitted by the zoning regulations or a quarrying operation precluded by the regulations.  Compare Town of Monkton Zoning Regulations § 564 (1977) [hereinafter Regulations] (permitting soil, sand, or gravel extraction operations in any zoning district), with § 240 (excluding any use not specifically enumerated).  The DRB addressed this issue in the initial application hearing on April 24, 2012.  The matter was continued and subsequent hearings were held on May 22, July 24, August 28, and October 23, 2012.

---

[1]  After referring the matter to the DRB, the zoning administrator denied the application on February 9, 2012.  Applicants appealed this decision to the DRB, but because the referred application was still before the DRB, the DRB's counsel determined that the zoning administrator was "without authority" to deny the application.  Counsel then stated that the DRB could review the application as originally referred to the DRB.

¶ 5.    Prior to the October 23 hearing, the DRB sent a letter to the parties outlining the procedures to be followed. According to the letter, following the hearing, the DRB intended to decide the discrete threshold issue of whether the proposal was a permitted gravel extraction operation.

¶ 6.    Although the DRB took further evidence at the October 23 meeting, including expert testimony, it did not come to a decision. At the meeting's conclusion, the DRB unanimously voted to continue the public hearing to November 27. On November 13, prior to the next public meeting, the DRB discussed the application in a private, deliberative session; the Environmental Division found that this session was not a public hearing on the application. Thereafter, because of public and personal commitments, the DRB notified the parties that it could not reach a decision before the November 27 hearing; instead, it would officially open the hearing at the scheduled time and then continue it to a date certain. The DRB did just that on November 27, opening the hearing and continuing it to January 22, 2013. No one opposed the DRB's action.

¶ 7.    On January 22, 2013, the DRB held its final public hearing on the application. At that meeting, it formally admitted into evidence a number of documents submitted by applicants and other parties to the DRB since the October 23 hearing. Applicants' attorney spoke on a number of procedural issues, including whether the application was deemed approved in the period between the November 27, 2012 hearing and the January 22, 2013 hearing.

¶ 8.    At the conclusion of the January 22, 2013 hearing, the DRB formally adjourned the hearing and voted to deny the application. The DRB issued the written denial on February 26, 2013. It determined that the zoning regulations permitted extraction of naturally occurring gravel, but not applicants' proposed method of blasting, drilling, and crushing ledge rock to produce gravel.

3

¶ 9. Applicants filed for declaratory judgment in the Environmental Division, claiming the protracted review process caused their application to be deemed approved under 24 V.S.A. § 4464(b)(1). In a separate appeal, applicants sought review of the DRB's denial of the application. In this second proceeding, Orlandi was granted intervenor status and cross-appealed pursuant to Rule 5(b)(2) of the Vermont Rules of Environmental Court Proceedings. Intervenor sought summary judgment on the merits; she argued that, as a matter of law, applicants' proposed project was not a permitted use because the Regulations only allowed gravel extraction and not blasting, drilling, and crushing ledge rock.

¶ 10. In a November 27, 2014 decision, the Environmental Division found that "it is undisputed that Applicants seek to remove ledge rock from the ground and crush it into gravel for sale." Because the Environmental Division held that § 564 did not authorize crushing quarried ledge rock to create gravel, it granted intervenor's motion for summary judgment on that issue. In a separate decision issued on January 30, 2014—prior to its summary judgment determination—the Environmental Division held that the application could not be deemed approved. Applicants appeal both decisions.

¶ 11. The standard of review shapes our decision in this case. We review the Environmental Division's legal decisions de novo, In re Lathrop Ltd. P'ship, 2015 VT 49, ¶ 21, __ Vt. __, 121 A.3d 630, but we defer to the court's construction of a zoning regulation "unless it is clearly erroneous, arbitrary, or capricious." In re Believeau NOV, 2013 VT 41, ¶ 8, 194 Vt. 1, 72 A.3d 918. This deference extends "to a municipality's interpretation of its own ordinance if it is reasonable and has been applied consistently." Lathrop, 2015 VT 49, ¶ 21; see In re Champlain Coll. Maple St. Dormitory, 2009 VT 55, ¶ 10, 186 Vt. 313, 980 A.2d 273. Because our review is limited, appellants "must overcome a deferential standard of review to prevail on their challenge." In re Route 103 Quarry (J.P. Carrara & Sons, Inc.), 2008 VT 88, ¶ 4, 184 Vt. 283, 958 A.2d 694.

¶ 12. Like the DRB and Environmental Division, we focus our review on Regulation § 564, which is entitled "Extraction of Soil, Sand, and Gravel." The section states in pertinent part: "In accordance with Section 4407(8) of the Act [24 V.SA.], the removal of soil, sand or gravel for sale . . . shall be permitted only upon approval of a plan for the rehabilitation of the site by the [DRB] and after a public hearing." Section 564's subsections list additional requirements for extraction operations. For instance, § 564(1) provides that "a performance bond shall be secured from the applicant" to cover the rehabilitation of the land. Section 564(5) states that "[n]o excavation, blasting, or stockpiling of materials shall be located within two hundred feet of any street or other property line." Finally, § 564(6) restricts the use of power-activated sorting machinery.

¶ 13. We construe zoning ordinances according to the principles of statutory construction, In re Laberge Moto-Cross Track, 2011 VT 1, ¶ 8, 189 Vt. 578, 15 A.3d 590 (mem.), and adopt an analysis that implements the legislative purpose. If the plain language of the regulation unambiguously reflects the legislative purpose, we will enforce the terms of the regulation. Lathrop, 2015 VT 49, ¶ 22. On appeal, applicants and Monkton offer competing interpretations of § 564.

¶ 14. Applicants argue that § 564's language demonstrates the drafters intended to allow a category of use—gravel extraction—without excluding the means of accomplishing the use—quarrying rock and then blasting and crushing the rock. Applicants contend that the word "extraction" in § 564's heading is a general term that includes mining or quarrying and that the definition of "extraction" contemplates a forcible action, such as blasting. Applicants also state that "gravel," as commonly understood in the industry, refers to the particle size and not to the gravel's origin. Thus, according to applicants, the words "extraction" and "gravel" should be read to permit quarrying rock and then blasting and crushing it to produce specific sizes.

5

¶ 15. Further, applicants argue that several subsections of § 564 show the drafters intended to allow gravel production through blasting, drilling, and crushing quarried ledge rock. For example, Section 564(2) sets out rules for leveling slopes, removing hills, and digging or creating pits, activities applicants assert cannot be accomplished without blasting and drilling. Similarly, § 564(5) specifically authorizes "blasting" if conducted a certain distance from the street or property line. When read as a whole, applicants claim that the drafters intended these subsections to regulate the drilling, blasting, and crushing necessary to produce gravel from ledge rock. Finally, applicants contend that the Environmental Division impermissibly imposed a limitation not present in the regulations by distinguishing between producing gravel by blasting quarried ledge rock and extracting naturally occurring gravel.

¶ 16. By contrast, Monkton argues that the plain language of § 564 only permits the removal of naturally occurring gravel, not the blasting and drilling of quarried ledge rock to produce gravel. Monkton points out that the Town enacted § 564 "pursuant to 24 V.S.A. § 4407(8)," which was repealed in 2004. Former § 4407(8) allowed municipalities to adopt regulations governing the "operation of sand and gravel excavations or soil removal"; further, the adopted regulations could require potential permittees to submit an acceptable plan for rehabilitating the site after operations concluded and to assure the rehabilitation with a bond, escrow account, or other surety acceptable to the municipality's legislative body. The former section also stated: "However, this provision does not apply to mining or quarrying." § 4407(8) (repealed 2004). Monkton relies on this former section's text to bolster its argument that, when Monkton enacted § 564, municipalities were limited in their ability to adopt regulations governing mining or quarrying. According to Monkton, by referencing the authorization contained in § 4407(8), the drafters specifically intended § 564 to exclude mining and quarrying from the extraction of naturally occurring gravel.

6

¶ 17. Both the DRB and the Environmental Division found that blasting, drilling, and crushing ledge rock to create gravel-sized pieces differed from extracting or removing naturally occurring gravel for sale; therefore, applicants' permit could not be granted under § 564. The Environmental Division also relied on § 240 of the Regulations, which provides, "[a]ny use not permitted by these Regulations shall be deemed prohibited."[2] We agree with the Environmental Division that the plain language of § 564 supports a distinction between naturally occurring gravel and gravel created using the applicants' proposed method. See Lathrop, 2015 VT 49, ¶ 22.

¶ 18. Section 564 begins with the heading, "Extraction of soil, sand or gravel." We construe zoning regulations "in light of the intention indicated by the caption" to avoid unfounded interpretations. State v. Lynch, 137 Vt. 607, 613, 409 A.2d 1001, 1005 (1979) (citing Audette v. Greer, 134 Vt. 300, 302, 360 A.2d 66,68 (1976)). The caption restricts a general word—"extraction"—to three specific materials: soil, sand, or gravel. Similarly, § 564's first paragraph repeats the language, substituting "removal" for "extraction" and listing the same naturally occurring materials. § 564 (permitting "the removal of soil, sand or gravel for sale" in accordance with 24 V.S.A. § 4407(8)). Soil, sand, and gravel can be found in naturally occurring beds, so it is reasonable to assume the drafters intended to regulate three similar naturally occurring materials. See MacDonough–Webster Lodge No. 26 v. Wells, 2003 VT 70, ¶ 11 n.2, 175 Vt. 382, 834 A.2d 25 (stating that a word can roughly be defined "by its associates").

¶ 19. Like this analogous grouping of materials, parsing § 564's parallel phrases— "extraction of soil, sand or gravel" and "removal of soil, sand or gravel"—supports our reading

---

[2] In 1986, Monkton amended the Regulations, adding a definition of "land development" that includes "any mining, excavation, or landfill." See Amendments to the Monkton Zoning Regulations § 130 (1986) [hereinafter Amended Regulations]. But neither the Regulations nor the Amended Regulations specifically list mining or quarrying as either prohibited or conditional uses. See § 561 (limiting uses such as junk yards, unenclosed manufacturing, and machinery wrecking yards while prohibiting uses like smelters, blast furnaces, and hide tanning).

of the Regulation. Words not defined within a statute are given their plain and ordinary meaning, which may be obtained by consulting dictionary definitions.[3] Franks v. Town of Essex, 2013 VT 84, ¶ 8, 194 Vt. 595, 87 A.3d 418. "Gravel" is defined as "any unconsolidated mixture of rock fragments or pebbles." American Heritage Dictionary of the English Language 575 (New College Ed. 1979). This definition does not encompass consolidated materials like ledge rock. Moreover, the nouns "removal" and "extraction" connote taking a material from one place and moving it to another. For example, "remove" means "To move from a position occupied" or "To convey from one place to another" or "To take away; to extract; to separate." Id. at 1101 "Extract" means "To draw out or forth forcibly" or "To obtain despite resistance" or "To remove." Id. at 465. Neither noun suggests the object being moved undergoes a material change or transformation, such as crushing or blasting. Instead, the preposition "of" limits the material being moved to unconsolidated mixtures, like gravel.

¶ 20.    In addition to the heading and the ordinary meaning of the language, the inclusion of former § 4407(8) in § 564's first paragraph supports a clear distinction between natural gravel extraction and gravel obtained via quarrying. As explained above, former § 4407(8) explicitly separated mining or quarrying from gravel extraction. We should give weight to this sort of statutory distinction imposed by the Legislature. See In re White, 155 Vt. 612, 619, 587 A.2d 928, 932 (1990) ("[T]he municipality's ordinance should be read to include and effectuate state policy."). Indeed, in Lathrop, we recently considered the same statute—former § 4407(8)—and noted that "the Legislature found reason to single out sand and gravel extraction as distinct from mining and quarrying and entitled to special treatment." Lathrop, 2015 VT 49, ¶ 23, n.6. In that case, we analyzed the Town of Bristol's bylaws, which—like Monkton's Regulations—

---

[3]    The definitions section of the Regulations, Article I, does not provide a definition of sand and gravel extraction.

8

contained zoning language incorporating former § 4407(8).[4] Town of Bristol Zoning Bylaws & Regulations § 526 (2003) [hereinafter Bristol Bylaws]; Lathrop, 2015 VT 49, ¶ 13. We found that numerous towns adopted former § 4407(8) to fit their particular sand and gravel needs, "all tailored somewhat differently." Lathrop, 2015 VT 49, ¶ 25. Moreover, we rejected an interpretation of Bristol's Bylaws that "would negate the more individualized language incorporated by the towns into these bylaws" and disregard the Legislature's separate treatment of soil, sand, and gravel removal from mining and quarrying. Id. ¶¶ 25, 26. Similarly, if we held as applicants request here, we would ignore the Legislature's directions in former § 4407(8) and strike a path away from the particular treatment that Monkton choose for gravel extraction. See generally Lathrop, 2015 VT 49, ¶ 26; Flanders Lumber & Bldg. Supply Co. v. Town of Milton, 128 Vt. 38, 45, 258 A.2d 804, 808 (1969) (noting municipalities possess zoning authority only in accordance with state terms and conditions).

¶ 21. Finally, an examination of § 564's subdivisions demonstrates a consistent regulatory structure governing natural gravel operations. We construe zoning regulations to give effect to the whole without being limited to a single sentence. In re Champlain Coll. Maple St. Dormitory, 2009 VT 55, ¶ 13. Section 564(2) sets out rules for leveling slopes, removing hills, and digging or creating pits, activities that occur in natural gravel bed operations. Section 564(5) authorizes "blasting" if conducted a certain distance from the street or property line. As applicants' expert testified, blasting may occur in natural gravel operations to remove bedrock knobs that block access to natural gravel deposits. Similarly, § 564(6) governs the use of sorting and crushing machinery. The same expert indicated that some natural gravel operations "bring in rock and rock quarry . . . to beneficiate the gravel because it's too soft"; these gravel

---

[4] Bylaw § 526 reads in full: "In accordance with [24 V.S.A. § 4407(8) ], in any district the removal of sand or gravel for sale, except when incidental to construction of a structure on the same premises, shall be permitted only after conditional use review and approval by the Board of Adjustment." This paragraph is followed by nine subdivisions that largely track the subdivisions in the Regulation at issue in this case. See Regulation § 564.

9

operations use machinery to crush and mix the imported quarry rock with natural gravel extracted on site. As a whole, therefore, § 564's subdivisions evince a legislative intent to regulate operations that extract naturally occurring gravel, not operations that create gravel by drilling, blasting, and crushing quarried rock.

¶ 22. Although applicants protest that this interpretation improperly creates a distinction between crushed-quarried rock and natural-gravel operations, we note that many of the sources and experts cited by applicants distinguish between natural-gravel and crushed-quarried rock. See, e.g., Vermont Agency of Transportation, 2011 Standard Specifications for Construction Book § 704.05, perma.cc/PJS4-A5P8 (noting that "crushed gravel" for subbase can be produced from "natural gravels or crushed quarried rock") (emphasis added). Moreover, applicants offer competing definitions that, according to applicants, demonstrate why this distinction is absurd according to industry standards.

¶ 23. But these arguments do not rise to the level necessary to overcome the deferential standard of review outlined above. Supra, ¶ 10. The issue here is the meaning of a zoning regulation. It is not our place to ask why Monkton separated natural-gravel operations from crushed-rock operations, only to affirm a reading of the Regulations that is not arbitrary. Given § 564's heading, the plain meaning of the section's words, the incorporation of former § 4407(8), and the consistency of § 564's subdivisions, the Environmental Division reasonably based its holding on the plain language of the regulation; this decision was not clearly erroneous, arbitrary, or capricious.

¶ 24. The second issue in this case is whether the Environmental Division correctly denied applicants' claim that the permit should have been deemed approved pursuant to 24 V.SA. § 4464(b)(1). Section 4464 governs municipal decisions involving development review applications; specifically, § 4664(b) directs a municipal panel's decision-making process after public hearings. Id. Under § 4464(b)(1), a municipal panel may "recess the proceedings on any

application pending submission of additional information" and "should close the evidence promptly after all parties have submitted the requested information." Once the hearing is formally adjourned, the panel shall "issue a decision within 45 days after the adjournment of the hearing." Id. If the panel does not issue a written decision within forty-five days, the application shall be deemed approved "and shall be effective on the 46th day." Id.

¶ 25. In this case, applicants and Monkton argue that different dates mark the formal adjournment of the hearing and the beginning of the forty-five day period; the date offered by applicants would trigger the deemed-approval remedy, while the date provided by Monkton would preclude deemed-approval. The Environmental Division agreed with Monkton that the DRB properly continued the public hearings on the application until the final January 22 hearing and issued its decision within the forty-five day period. On appeal, intervenor points out that the Environmental Division's decision on the merits occurred after its decision regarding the deemed-approval remedy; therefore, she argues that the deemed-approval argument has been rendered moot by the trial court's de novo review of the application's merits.

¶ 26. The deemed-approval remedy occupies a prominent place in chapter 117 of Title 24; as a result, we have construed the statutory language numerous times. See, e.g., In re Morrill House, LLC, 2011 VT 117, ¶ 11, 190 Vt. 652, 35 A.3d 148 (mem.) (strictly construing deemed-approval remedy). We have consistently stated that the purpose of the deemed-approval remedy is "to constitute a final decision to provide a mechanism for any interested party to appeal the decision." In re Trahan NOV, 2008 VT 90, ¶ 12, 184 Vt. 262, 958 A.3d 665 (analyzing predecessor statute); see also Morrill House, LLC, 2011 VT 117, ¶ 8 (applying similar language to current § 4464). The deemed-approval remedy is not meant to foreclose appeals on the merits but to protect against "protracted deliberations" by a municipal panel. In re Fish, 150 Vt. 462, 464, 554 A.2d 256, 258 (1988) (interpreting predecessor statute). Further, the remedy must be applied carefully to ensure any deemed-approval permit remains clearly consistent with the

intent of the applicable zoning regulations. Trahan, 2008 VT 90, ¶ 12; Morrill House, 2011 VT 117, ¶ 8. Thus, even if an application is deemed approved pursuant to statute, an interested party must be allowed the opportunity to timely appeal the deemed-approved permit on the merits. The ability to timely appeal a deemed-approved permit not only comports with the statutory intent behind the deemed-approval remedy, Trahan, 2008 VT 90, ¶ 12, but also guarantees interested parties can challenge a deemed-approved permit that they feel is inconsistent with the intent of zoning regulations. Id.

¶ 27. In this case, intervenor filed a timely cross-appeal and motion for summary judgment on the merits in the Environmental Division. As a result, even if applicants' request for a deemed-approved permit had legs, the Environmental Division would still have jurisdiction to address intervenor's cross-appeal on the merits. To decide otherwise would be to foreclose intervenor's opportunity for an appeal. Cf. Fish, 150 Vt. at 464, 554 A.2d at 258. We have already affirmed the Environmental Court's decision on the merits of the application. Thus, we do not need to address the arguments concerning the deemed-approval remedy because the resolution does not affect our decision on the merits of the zoning application.

¶ 28. Although we do not consider the applicability of the deemed-approval remedy, we hold that the deemed-approval remedy does not foreclose an interested party's timely appeal on the merits of the application. Applicants suggested in proceedings before the Environmental Division and at oral argument before this Court that the deemed-approval remedy would effectively prevent intervenor or any other interested party from appealing the approved permit. This interpretation does not comport with the statute's purpose because it does not provide a mechanism for an interested party to appeal the decision. Trahan, 2008 VT 90, ¶ 12. Intervenor was entitled to have the Environmental Division rule on the merits of the application, regardless of whether or not the application was deemed-approved.

¶ 29.    We affirm the Environmental Division's denial of the application.  Although our holding on the merits of the zoning application restricts full consideration of the deemed-approval remedy, we conclude that the deemed-approval remedy does not preclude the timely appeal of an interested party.

Affirmed.

FOR THE COURT:

_____

Associate Justice