NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2020 VT 15

No. 2019-122

In re Snyder Group, Inc. PUD Final Plat

Supreme Court

On Appeal from
Superior Court,
Environmental Division

September Term, 2019


Thomas S. Durkin, J.

Matthew B. Byrne of Gravel & Shea PC, Burlington, for Appellants Snyder Group, Inc.,
  Spear Meadows, Inc., 1350 Spear, LLC, and Gary Farrell.

Daniel A. Seff of MSK Attorneys, Burlington, for Appellees/Cross-Appellants Mary Scollins,
  Michael Scollins, Marley Skiff, Robert Skiff and the Pinnacle at Spear Homeowners
  Association.


PRESENT:  Reiber, C.J., Robinson, Eaton and Carroll, JJ., and Skoglund, J. (Ret.),
           Specially Assigned


¶ 1.  **REIBER, C.J.**  Applicant, the Snyder Group, Inc., which initially obtained approval from the City of South Burlington Development Review Board (DRB) to construct a planned unit development (PUD), appeals the Environmental Division's summary judgment rulings that the City's governing zoning bylaw concerning the transfer of development rights (TDRs) with respect to PUD applications does not comply with two subsections of the enabling statute and is unconstitutionally vague.  Neighbors, as interested parties opposing the PUD, cross-appeal with respect to the Environmental Division's rulings that the TDR bylaw complies with three subsections of the enabling statute.  We uphold the rulings challenged by neighbors, reverse

the rulings challenged by applicant, and remand the matter for Environmental Division to enter summary judgment in favor of applicant.

¶ 2.     The material facts are undisputed.  In April 2017, applicant submitted a subdivision application to construct a PUD on a 25.93-acre parcel in the City's Southeast Quadrant Neighborhood Residential (SEQ-NR) Zoning District.[1]  Applicant proposed to raze one single-family dwelling and to construct eighteen single-family dwellings, three three-unit multi-family dwellings, and ten two-family dwellings.  The forty-eight-unit PUD proposal includes seventeen units of TDRs from a separate parcel known as the Bread and Butter Farm.

¶ 3.     Following a public hearing, the DRB granted final plat approval in a twenty-two-page decision that reviewed PUD and site-plan standards and criteria.  The DRB determined that the density of the proposed PUD complied with the City's governing land development regulations, including the regulations allowing TDRs for PUDs.

¶ 4.     Neighbors appealed to the Environmental Division, arguing, in relevant part, that the City's TDR bylaw[2] violated its enabling statute and was unconstitutionally vague, rendering it invalid and unenforceable.  In response to neighbors' and applicant's cross-motions for summary judgment, the Environmental Division ruled in a February 2019 decision that the TDR bylaw did not comply with two subsections of the enabling statute and was unconstitutionally vague.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  V.R.C.P. 56(a); see V.R.E.C.P. 5(a)(2) (providing, in relevant part, that rules of civil procedure are applicable in

---

[1]  There are six subdistricts in the City's Southeast Quadrant district: SEQ-NRP (natural resources protection); SEQ-NRT (neighborhood residential transition); SEQ-NR (neighborhood residential); SEQ-NRN (neighborhood residential north); SEQ-VR (village residential); and SEQ-VC (village commercial).

[2]  Like the Environmental Division, we refer to the relevant land development regulations in this case as the TDR bylaw.

2

proceedings before Environmental Division except as otherwise modified).  "The party opposing summary judgment is given the benefit of all reasonable doubts and inferences" with respect to the facts.  State of Vt. Agency of Nat. Res. v. Parkway Cleaners, 2019 VT 21, ¶ 11, ___ Vt. ___, 210 A.3d 445 (quotation omitted).

¶ 5.    Applicant appeals, challenging both rulings, and neighbors cross-appeal, arguing that the bylaw does not comply with any of the enabling statute's five subsections, in addition to being unconstitutionally vague.  The City was a party in the Environmental Division proceedings but did not file a notice of appeal from the Environmental Division's rulings.  Nevertheless, the City has filed two appellate briefs, the first one labeled an appellee's brief and the second one an appellee's brief "in Cross-Appeal."  Even though the briefs were filed as appellee's briefs, they both take a position consistent with applicant's in support of the validity and constitutionality of the TDR bylaw and contrary to the Environmental Division's judgment.

¶ 6.    Neighbors have filed motions to strike the briefs and dismiss the City's appeal.  The City counters that it is not raising new issues but simply commenting on issues raised by the appealing parties.  Because the City did not file a notice of appeal, there is no appeal to dismiss. For the following reasons, however, we grant neighbors' motion to strike the City's briefs.  First, the City is not an appellee but rather a party aligned with applicant—the appellant in this appeal. See Appellee, Black's Law Dictionary (11th ed. 2019) (defining appellee as "party against whom an appeal is taken and whose role is to respond to that appeal, usu. seeking affirmance of the lower court's decision"); 16A C. Wright et al., Federal Practice and  Procedure § 3950.7, at 498 (5th ed. 2019) ("In general parlance, a cross-appeal is one filed by the appellee against the first or only appellant.  A separate appeal is an appeal filed by any party other than the first appellant or appellee."); see also Ark. Cty. v. Desha Cty., 27 S.W.3d 379, 382 (Ark. 2000) (striking utility commission's brief where commission "failed to file either a notice of appeal or cross-appeal and

3

yet filed a brief [as an appellee's brief] advancing the appellant's arguments too late to give the remaining appellees an opportunity to respond").

¶ 7. Second, and more importantly, "[o]nce one party has filed a notice of appeal, other parties who have not joined in that initial notice of appeal must file their own notices of appeal if they wish to attack all or a portion of the judgment below and to be relieved of the consequences thereof." 16A Wright et al., supra, § 3950.7, at 499. The governing principle is that "any named party, without filing a separate or cross-appeal, may make or renew in the appellate court any available argument designed to preserve or justify that portion of the judgment favorable to that party," but a separate appeal or cross-appeal "is required if a party wishes to attack the judgment to enlarge the party's rights under the judgment or to lessen the rights of the party's opponent." Id.; see also Jennings v. Stephens, 135 S. Ct. 793, 798 (2015) ("[A]n appellee who does not cross-appeal may not attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary." (quotation omitted)); Huddleston v. Univ. of Vt., 168 Vt. 249, 255, 719 A.2d 415, 419 (1998) ("An appellee seeking to challenge aspects of a trial court's decision must file a timely cross-appeal, unless, of course, the party was content with the final order below, leaving it nothing to appeal" (citation omitted)).

¶ 8. We recognize that our current appellate rules do not explicitly address situations such as this. See V.R.A.P. 3(c) (providing that parties may file joint appeal and proceed as single appellant or may file separate notices of appeal, which may be consolidated); V.R.A.P. 4(a)(6) (providing that once one party files timely notice of appeal, "any other party may file a notice of appeal within 14 days after the date when the first notice was filed, or within the time otherwise prescribed by this rule, whichever period ends later"); see also 16A Wright et al., supra, § 3950.7, at 507 ("The 14-day provision [in F.R.A.P. 4] is not limited to cross-appeals, and plainly encompasses appeals by other parties such as co-parties or third-party defendants."). Accordingly, the matter will be referred to the Civil Rules Committee to consider whether to propose any

4

amendments to the appellate rules. See, e.g., In re M.K.M.R., 199 P.3d 1038, 1040-41 (Wash. Ct. App. 2009) (applying appellate rule providing that court will grant relief to one of multiple parties on one side of case only if party has filed notice of appeal or been joined in appeal or "if demanded by necessities of the case"); see also 16A Wright et al., supra, § 3949.2, at 85 ("A number of courts set a requirement (or presumptive requirement) that parties on the same side of consolidated appeals file a joint brief.").

¶ 9. Before addressing the appealing parties' arguments, we set forth the relevant law. The enabling statute at issue in this case is 24 V.S.A. § 4423, entitled "Transfer of development rights." Section 4423(a)[3] provides as follows:

> In order to accomplish the purposes of 10 V.S.A. § 6301[4], [municipal] bylaws may contain provisions for the transfer of development rights. The bylaws shall do all the following:
>
> (1) Specify one or more sending areas for which development rights may be acquired.
>
> (2) Specify one or more receiving areas in which those development rights may be used.
>
> (3) Define the amount of density increase allowable in receiving areas, and the quantity of development rights necessary to obtain those increases.
>
> (4) Define "density increase" in terms of an allowable percentage decrease in lot size or increase in building bulk, lot coverage, or ratio of floor area to lot size, or any combination.
>
> (5) Define "development rights," which at minimum shall include a conservation easement, created by deed for a specified period of not less than 30 years, granted to the municipality under 10 V.S.A.

---

[3] In 1986, the Legislature first enacted into law, as 24 V.S.A. § 4407(16), language essentially identical to that currently included in § 4423(a). See 1985, No. 243 (Adj. Sess.), § 6.

[4] Section 6301 provides that the purpose of chapter 155 in Title 10, entitled "Acquisition of Interests in Land by Public Agencies," is to maintain uses of undeveloped land, prevent accelerated residential and commercial development of such land, preserve Vermont's scenic natural resources, enable orderly growth in the face of increasing development, and strengthen Vermont's economy and its recreation industry by encouraging the use of conservation and preservation tools to support farm and forest enterprises. 10 V.S.A. § 6301.

chapter 155, limiting land uses in the sending area solely to specified purposes, but including, at a minimum, agriculture and forestry.

¶ 10.    The key provisions of the TDR bylaw became effective in the early 2000s and were last updated prior to this case in 2016.  Although the maximum assigned density in the Southeast Quadrant residential subdistricts is generally 1.2 dwelling units or lots per acre, up to four dwelling units per acre and four dwelling units per structure are permitted within a contiguous development parcel subject to a single PUD in the SEQ-NR district.  See South Burlington Land Development Regulations, Southeast Quadrant, § 9.05(A), (B)(3) (adopted May 12, 2003; amended effective June 27, 2016).  Under § 9.13(C),[5] entitled "Transfer of Development Rights and Non-Contiguous PUDs," the DRB may approve a PUD application involving noncontiguous parcels and the transfer "of all or a portion of the residential development density calculated for a non-contiguous encumbered parcel to another parcel" in satisfaction of § 9.05 subject to the following conditions: the applicant demonstrates "that development rights have been secured and encumbered from lands lying within the SEQ-NRP or SEQ-NRT sub-districts" and either "the sending parcel is sufficiently encumbered against further land subdivision and development through a purchase or other agreement acceptable to the City Attorney to ensure conformance with these regulations" or an encumbered parcel that is "not subject to a permanent conservation easement or restriction of similar binding effect shall be reviewed as [a] component[] of the PUD" and subject to the applicable regulations.  Id. § 9.13(C)(1)-(2).

_____

[5]  In November 2019, the City enacted interim bylaws that, among other things, temporarily disallowed subdivisions and PUDs in all but the Transit Overlay District and certain business parks until the City undertook an analysis of undeveloped open spaces, completed an extensive study of PUDs and master plans, undertook an analysis of the program for TDRs established in the land development regulations, and conducted a cost-benefit analysis of hypothetical development. Accordingly, the October 28, 2019 amendments to the land use regulations removed § 9.13C. None of these actions have any impact on this case, which is governed by the land development regulations as amended in 2016.

¶ 11. The issues before us in this appeal are whether the City's 2016 TDR bylaw is invalid because it fails to comply with the requirements set forth in § 4423(a) and whether it is void for vagueness.[6] The Environmental Division ruled that the bylaw is invalid because it does not comply with subsections (3) and (5) of § 4423(a) and is unconstitutionally vague. Regarding compliance with § 4423(a), we consider each of § 4423(a)'s five subsections, insofar as neighbors contend that the City's TDR bylaw does not comply with any of those subsections.

¶ 12. Before considering § 4423(a), however, we address applicant's contention that the controlling statute in determining the TDR bylaw's compliance with state law is primarily § 4410 of Title 24 rather than § 4423(a). Section 4410, which was added in 2004, see 2003, No. 115 (Adj. Sess.), § 95, provides that a municipality: (1) "may define and regulate land development in any manner that the municipality establishes in its bylaws, provided those bylaws are in conformance with the [town] plan and are adopted for the purposes set forth in section 4302[7] of this title"; and (2) "may utilize any or all the tools provided in this subchapter and any other regulatory tools or methods not specifically listed," except that "no bylaws shall directly conflict with sections 4412 and 4413 of this title and subchapters 9, 10, and 11 of this title."[8] 24 V.S.A. § 4410.

---

[6] For consistency's sake, we will use the present tense when referring to the land development regulations that comprise the TDR bylaw in this case, even though, as noted, the key TDR provision, § 9.13(C), was removed pursuant to a 2019 amendment to the City's land development regulations.

[7] Section 4302(a) of Title 24 cites multiple general purposes underlying the statutory provisions concerning municipal and regional planning and development, including facilitating the growth of villages, towns and cities while protecting residential and agricultural areas from overcrowding. Section 4302(b) lists a wide range of goals connected to municipal planning and development.

[8] Section 4412 lists land development provisions that shall apply in every municipality. Section 4413 limits the types of municipal zoning restrictions that may apply to specified uses such as state facilities, schools, hospitals, and other entities. Subchapters 9, 10, and 11 of the chapter on municipal and regional planning and development concern, respectively, adoption, administration, and enforcement of bylaws; appropriate municipal panels and procedures for development review; and appeals. See 24 V.S.A. §§ 4440-4476.

¶ 13.   Applicant argues that § 4410, which the Legislature enacted to address regulatory impediments to land development and to give municipalities more flexibility in the management of land development and conservation, provided the City the authority to enact the TDR bylaw at issue in this case.  According to applicant, the Environmental Division incorrectly concluded that there is a conflict between § 4410 and § 4423(a).  In applicant's view, there is no conflict between the two statutes, and even if there were, § 4410 was enacted far more recently than the language contained in § 4423(a), which, as noted, dates back to 1986.  Appellant asserts that the City's TDR bylaw is effective under § 4410 even if the bylaw fails to comply with some or all of the specific requirements set forth in § 4423(a).

¶ 14.   This argument is based on a false premise and overstates the authority that § 4410 affords municipalities with respect to using TDRs.  As an initial matter, the Environmental Division did not determine that there was a conflict between the two statutes; rather, the court stated only that, given the specific requirements set forth in § 4423(a), it was unconvinced that the broad grant of authority in § 4410 negated or superseded the clear directives set forth in § 4423(a).  We agree with that assessment.  To be sure, in enacting § 4410, the Legislature intended to confer upon municipalities flexibility in applying a broad array of regulatory tools and methods with respect to regulating local land development.  But the Legislature explicitly addressed one of those tools—the use of TDRs—in § 4423(a) and set forth specific still-viable requirements in that provision.  Longstanding rules of statutory construction counsel "that a specific statute [dealing with the same subject matter] governs over a more general one," Parkway Cleaners, 2019 VT 21, ¶ 40, and that "[w]hen two statutes deal with the same subject matter and one is general and the other special, they must be read together and harmonized if possible to give effect to a consistent legislative policy," Blundon v. Town of Stamford, 154 Vt. 227, 229-30, 576 A.2d 437, 439 (1990) (quotation omitted).  Keeping in mind our overriding goal of discerning legislative intent, see In re Eustance Act 250 Jurisdictional Op., 2009 VT 16, ¶ 35, 185 Vt. 447, 970 A.2d 1285, we

8

conclude that § 4423(a)'s more specific authorization with limitations set forth therein constrains the City, but that in determining how strictly to construe that statutory provision, we take into account the Legislature's general guidance in § 4410 that municipalities should have broad flexibility in regulating local land development.

¶ 15.   We now consider whether the TDR bylaw at issue in this appeal complies with the five subsections of § 4423(a).  "While municipalities are entitled to create their own regulatory ordinances, those ordinances must conform to statutory standards."  N. Country Sportsman's Club v. Town of Williston, 2017 VT 46, ¶ 12, 205 Vt. 1, 170 A.3d 639.  Nonetheless, "[t]his Court reviews zoning ordinances narrowly, overturning only those that are clearly unreasonable, irrational, arbitrary, or discriminatory."  In re White, 155 Vt. 612, 617, 587 A.2d 928, 931 (1990); see also Town of Brattleboro v. Nowicki, 119 Vt. 18, 19, 117 A.2d 258, 259 (1955) ("When an ordinance is passed relating to a subject matter within the legislative power of the municipality, every reasonable presumption is made in favor of its validity.").  "If an ordinance does not properly comply with or effectuate a statute, that ordinance should be read to include and effectuate the statute."  N. Country Sportsman's Club, 2017 VT 46, ¶ 12 (quotation omitted); see also In re LaBerge Moto-Cross Track, 2011 VT 1, ¶ 8, 189 Vt. 578, 15 A.3d 590 (mem.) ("We adopt a construction that implements the ordinance's legislative purpose and, in any event, will apply common sense.").  As with statutes, "[w]hen interpreting zoning ordinances, we construe words according to their plain and ordinary meaning, giving effect to the whole and every part of the ordinance."  In re Trahan NOV, 2008 VT 90, ¶ 19, 184 Vt. 262, 958 A.2d 665; see also Brisson Stone, LLC v. Town of Monkton, 2016 VT 15, ¶ 21, 201 Vt. 286, 143 A.3d 550 ("We construe zoning regulations to give effect to the whole without being limited to a single sentence.").

¶ 16.   Neighbors' arguments that the TDR bylaw fails to comply with subsections (1), (2), and (5) of § 4423(a) are interrelated.  Subsections (1) and (2) of § 4423(a) require a municipal TDR bylaw to specify, respectively, "sending areas" in which, and "receiving areas" for which,

9

"development rights" may be acquired and used. 24 V.S.A. § 4423(a)(1)-(2). Section (5) of § 4423(a) requires a TDR to define "development rights" and states that such rights must include at minimum a conservation easement for a period of not less than thirty years. Id. § 4423(a)(5). Neighbors argue that the TDR bylaw does not comply with any of these three sections because it does not define the terms "sending areas," "receiving areas," or "development rights." Neighbors acknowledge that § 9.04(C) designates "development areas" and "conservation" areas, but they assert, with little explanation, that those terms are not equivalent to the statutory terms "sending areas" and "receiving areas." Neighbors simply point to an alleged incongruity in the fact that § 9.13(C)(1)(a) allows an applicant to demonstrate that development rights have been secured from subdistricts SEQ-NRP or SEQ-NRT, even though § 9.04(C) designates SEQ-NRT as a development area.

¶ 17. The Environmental Division rejected the rigid construction favored by neighbors with respect to sections (1) and (2) of § 4423(a). In the court's view, § 4423(a)(1) and (2) require only that at a municipal TDR bylaw designate areas in which development rights may be acquired and used, which § 9.04 does by specifying conservation and development areas. We agree. Section 9.04(C) generally designates subdistricts as development areas or conservation areas. Section 9.13(C)(a)(1), the bylaw that specifically addresses TDRs and noncontiguous PUDs, provides that development rights must be secured from a "sending parcel" in subdistricts SEQ-NRP or SEQ-NRT. Section 9.13(C)(2) permits the DRB to approve a transfer of residential development density to another parcel (in the Southeast Quadrant District) pursuant to § 9.05, which allows increased density, under subsection B., in all subdistricts other than SEQ-NRP. The fact that development rights may be secured from subdistrict SEQ-NRT pursuant to § 9.13C even though that subdistrict is generally designated a conservation area in § 9.04(C) does not demonstrate that the TDR bylaw fails to comply with the requirements of § 4423(a). Section 9.13C is the controlling provision with respect to designating TDR sending areas for PUD applications.

10

In any event, although § 4423(a) requires TDR bylaws to specify sending and receiving areas, nothing in the enabling law prohibits municipalities from designating certain subdistricts as both sending and receiving areas. Nor do we find any basis to imply such a prohibition. In light of our narrow review of municipal zoning ordinances stated above, we reject neighbors' objections to the City's TDR bylaw based on the first two subsections of § 4423(a).

¶ 18. The Environmental Division ruled, however, that the TDR bylaw does not comply with § 4423(a)(5), which requires municipal TDR bylaws to define development rights and specifies the minimum development rights that must be secured. The court agreed with neighbors that the City's TDR bylaw does not comply with § 4423(a)(5) because it neither formally defines the term "development rights" nor references the minimum encumbered development rights set forth in that subsection of the statute. While recognizing the bylaw's condition that the city attorney find acceptable any agreement encumbering development rights on the sending parcel, the court noted that the bylaw does not specify the type of encumbrances that would satisfy the bylaw.

¶ 19. We find the Environmental Division's analysis overly confining. Subsection 2.02 of the City's land development regulations defines the word "development" in detail.[9] Subsection 2.01(F) of the regulations states that undefined words or phrases shall have their "plain and commonly accepted meaning." In relevant part, Black's Law Dictionary defines a right as "an interest, claim, or ownership that one has in tangible or intangible property." Right, Black's Law Dictionary (11th ed. 2019). The concept of development rights is not an obscure one. The City's regulations are sufficient to satisfy the requirement that development rights be defined. As for the

---

[9] Subsection 2.02 of the regulation defines development as: "(A) The carrying out of any change to improved or unimproved land, including but not limited to the construction, reconstruction, conversion, structural altercation, relocation, enlargement or use of any structure or parking area; (B) any mining, excavation, dredging, filling, grading, drilling or any land disturbance; (C) any use or extension of the use of the land; or (D) the subdividing of land into two or more parcels."

minimum development rights required by § 4423(a)(5), our case law supports reading in the required language by inference rather than invalidating the bylaw. Cf. In re Walker, 156 Vt. 639, 639, 588 A.2d 1058, 1059 (1991) (mem.) ("A municipal ordinance must be read to include the statutory requirements of 24 V.S.A. § 4407(2), and those requirements will govern whether or not they are expressly set forth in the ordinance."). Accordingly, we conclude that the provisions of § 4423(a)(5) apply to the TDR in this case, even though the TDR does not expressly so provide. Indeed, neighbors do not challenge the adequacy of the specific development rights to be transferred or the manner in which those development rights have been secured.

¶ 20. We now turn to § 4423(a)(3), which requires that a municipal TDR bylaw "[d]efine the amount of the density increase allowable in receiving areas, and the quantity of development rights necessary to obtain those increases." 24 V.S.A. § 4423(a)(3). The Environmental Division concluded that § 9.05(B), made applicable in § 9.13(C)(2), satisfies the first requirement of § 4423(a)(3)—that the bylaw define the amount of density increase allowable in receiving areas— by establishing a base density and a maximum density with respect to PUD applications involving TDRs. The court concluded, however, that the bylaw does not satisfy the second requirement of § 4423(a)(3) because no language in the City's regulations indicates the quantity of development rights necessary to obtain density increases in the receiving areas.

¶ 21. We conclude that the City's TDR bylaw complies with both requirements set forth in § 4423(a)(3). We agree with the Environmental Division that the regulations plainly state the amount of density increase by establishing a baseline maximum density and an allowable density in different Southeast Quadrant subdistricts for TDRs pursuant to a PUD application. As for defining the quantity of development rights necessary to increase density in the receiving area, the permitted quantity of increase is the difference between the base density and the allowable maximum density. In short, there is a one-to-one relationship between the development rights acquired and used—the amount of density increase allowable in the receiving areas and the

12

quantity of development rights necessary to obtain those increases. This is consistent with the DRB's calculations in determining the required quantity of development rights with respect to past proposed PUD applications under the TDR bylaw at issue here. See, e.g., Snyder S. Pointe Ltd. P'ship—111 Unswept Lane, Preliminary and Final Plat Application, #SD-14-14, at 2-3 (June 18, 2014); Dorset Street Assocs.—Cider Mill II Final Plat Application, #SD-08-34, at 2 (Oct. 17, 2007).

¶ 22. Finally, we consider § 4423(a)(4), which requires a municipal TDR bylaw to "[d]efine 'density increase' in terms of an allowable percentage decrease in lot size or increase in building bulk, lot coverage, or ratio of floor area to lot size, or any combination." 24 V.S.A. § 4423(a)(4). The Environmental Division concluded that the City's bylaw satisfies § 4423(a)(4) through a combination of: (1) § 9.05(B), which establishes a base density and maximum density in terms of dwelling units per acre for lots within Southeast Quadrant subdistricts; and (2) dimensional standards applicable to all districts, which not only establish minimum lot sizes in terms of maximum dwelling units per acre, but also set forth components of building bulk in terms of maximum building heights and the percentage of the site that can be covered by buildings. Neighbors argue that the TDR bylaw's "coarse attempt" to increase density in receiving areas by increasing dwelling units per acre fails to comply with the specific requirements of § 4423(a)(4). They contend that increasing dwelling units per acre does not necessarily provide for a percentage increase in either building bulk or lot coverage.

¶ 23. We find neighbors' analysis unduly constraining. Subsection (a)(4) allows density increase to be defined in "any combination" of either a decrease in lot size or an increase in building bulk, lot coverage, or ratio of floor size to lot size. To be sure, the City's TDR bylaw does not define density increase in any of those specific individual terms. But given the restrictions on minimum lot size, maximum site coverage, standard setbacks, and maximum building height set forth in the regulations' "Uses and Dimensional Standards," allowing density increase through

13

an increase in dwelling units per acre will, as a practical matter—notwithstanding neighbors' mathematical worse-case-scenario calculations to the contrary—increase density with respect to one or more of those individual terms. Indeed, in the context of a PUD, density of dwelling units is a more robust method for increasing density in the receiving area in exchange for a decreased density in the sending area—the primary purpose of the statute—than any of the individual statutory terms considered separately. We concur with the Environmental Division that the City's TDR bylaw satisfies § 4423(a)(4).

¶ 24. Regarding the constitutional challenge, the Environmental Division determined that the City's TDR bylaw was unconstitutionally vague for the same reason it did not comply with the second requirement of § 4423(a)(3)—it neither explicitly states the quantity of development rights that need to be acquired from sending areas to be used in receiving areas nor provides any guidance for the city attorney to determine whether to approve the assignment of all or a portion of the sending area's development rights. We conclude that the TDR bylaw is not unconstitutionally vague.

¶ 25. "Laws and regulations are unconstitutionally vague when they either fail to provide sufficient notice for ordinary people to understand what conduct is prohibited, or allow arbitrary and discriminatory enforcement." In re Beliveau, 2013 VT 41, ¶ 15, 194 Vt. 1, 72 A.3d 918. "The test for vagueness is less strict when applied to regulations that affect economic interests, not constitutional rights, and when the aggrieved party can seek clarification of its meaning or resort to administrative processes." Id. (quotation omitted). We will invalidate ordinances that lead to unbridled discrimination, but "we will uphold standards even if they are general and will look to the entire ordinance, not just the challenged subsection, to determine the standard to be applied." In re Pierce Subdivision Application, 2008 VT 100, ¶ 20, 184 Vt. 365, 965 A.2d 468; see also In re Handy, 171 Vt. 336, 348, 764 A.2d 1226, 1238 (2000) (recognizing that statutory standard

sufficient to overcome constitutional void-for-vagueness challenge "can be general, and can be derived from historical usage").

¶ 26.    Neighbors argue that the TDR bylaw does not provide any standards for the DRB to apply in determining whether to approve all or some of a developer's TDR request.  See City of South Burlington Land Development Regulations, § 9.13(C)(2) ("If the conditions of 9.13(C)(1) above are met, the Development Review Board may then approve the assignment (transfer) of all or a portion of the residential development density calculated for a non-contiguous encumbered parcel to another parcel to satisfy the provisions of Section 9.05 above." (emphasis added)). According to neighbors, the bylaw, like the ordinance provision this Court struck down in In re Appeal of JAM Golf, LLC, "fails to provide adequate guidance, thus leading to unbridled discrimination by the court and planning board charged with its interpretation."  2008 VT 110, ¶ 13, 185 Vt. 201, 969 A.2d 47.  Neighbors further argue that the TDR bylaw fails to provide adequate guidance for the city attorney to apply in determining whether the sending parcel is sufficiently encumbered "to ensure conformance with these Regulations."  City of South Burlington Land Development Regulations, § 9.13(C)(1)(a).[10]

¶ 27.    Our rejection of neighbors' statutory arguments effectively negates their facial void-for-vagueness challenge of a detailed TDR bylaw that imposes specific conditions on TDRs pursuant to PUD applications.  The proper inquiry in these circumstances is whether the TDR bylaw provides the DRB or a court "with sufficient overall standards" to approve a PUD—"a type of concentrated . . . development permitted in exchange for open space."  Pierce Subdivision, 2008

---

[10] In a single sentence at the end of their brief, neighbors argue, in the alternative, that even if the TDR bylaw is not unconstitutional on its face, it is unconstitutional as applied in this case. Absent extraordinary circumstances that do not exist here, this Court will not consider even constitutional arguments that are inadequately briefed.  See Pease v. Windsor Dev. Review Bd., 2011 VT 103, ¶ 29 n.4., 190 Vt. 639, 35 A.3d 1019 (mem.) (declining to address constitutional issue that was insufficiently raised and inadequately briefed).  Accordingly, we do address neighbors' argument that the TDR bylaw condition assigning discretion to the city attorney is unconstitutionally vague as applied.

VT 100, ¶ 21. The bylaw in this case plainly meets that standard, establishing multiple conditions for the city attorney and the DRB to consider with respect to PUD applications involving TDRs. Moreover, to succeed on a facial challenge, neighbors would have to demonstrate that the bylaw " 'is impermissibly vague in all its applications.' " CMR D.N. Corp. v. City of Philadelphia, 703 F.3d 612, 631 (3d Cir. 2013) (quoting Vill. of Hoffman Esates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 497 (1982)); see also In re LaBerge NOV, 2016 VT 99, ¶ 25, 203 Vt. 98, 152 A.3d 1165 (rejecting facial void-for-vagueness challenge, even though "there may be marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls"). Neighbors have failed to do so here.

¶ 28. We find unavailing neighbors' reliance on JAM Golf, a case in which this Court struck down, essentially on due process grounds, a municipal ordinance provision that required planned-residential-development designs to protect important natural resources, but that failed to provide any guidance to landowners as to what was expected of them in this regard. 2008 VT 110, ¶¶ 12-14. In contrast, the TDR bylaw at issue here provides "sufficient conditions and safeguards to guide applicants and decisionmakers." Id. ¶ 13 (quotation omitted).

The Environmental Division's decision finding the City of South Burlington's then-governing TDR bylaw invalid and unconstitutionally vague is reversed, and the matter is remanded for the court to enter summary judgment in favor of applicant.

FOR THE COURT:

_____

Chief Justice

16