VERMONT SUPERIOR COURT
Environmental Division
32 Cherry St, 2nd Floor, Suite 303,
Burlington, VT 05401
802-951-1740
www.vermontjudiciary.org



| Benson Road Site Plan & Cond. Use Application | Docket No. 20-ENV-00023 |
|---|---|

## DECISION ON MOTION

A group of neighbors ("Neighbors"),[1] appeal a decision of the Town of Manchester Development Review Board ("DRB") granting conditional use and site plan approval to a proposed "eco-resort" on adjacent property. Applicant Jeffrey Nyewide ("Applicant") cross-appeals one condition imposed by the DRB as part of its conditional use approval. The Town of Manchester ("The Town") has entered an appearance as an interested party. Presently before the Court is Neighbors' motion for partial summary judgment on their Statement of Questions ("Motion"), which Applicant opposes. We address the Town's motion to join or adopt Applicant's Memorandum in Opposition to summary judgment in a separate entry order. Neighbors are represented in this case by Nicholas AE Low, Esq. Applicant is represented by Christopher D. Roy, Esq. The Town is represented by James F. Carroll, Esq.

### Legal Standard

To prevail on a motion for summary judgment, the moving party must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a), applicable here through V.R.E.C.P. 5. The nonmoving party "receives the benefit of all reasonable doubts and inferences," but must respond with more than unsupported allegations in order to show that material facts are in dispute. Robertson v. Mylan Labs., Inc., 2004 VT 15, ¶ 15, 176 Vt. 356. For the purpose of reviewing this motion, the Court "will accept as true the allegations made in opposition to . . . summary judgment, so long as they are supported by

---

[1] Appellant Neighbors are Brian Benson, Susan Benson, John Benson, Donna Benson, and Mary Benson Herba.

affidavits or other evidentiary material." Id.; Pettersen v. Monahan Safar Ducham, PLLC, 2021 VT 16, ¶ 9.

### Background

We recite the following factual background and procedural history, which we understand to be undisputed unless otherwise noted, based on the record now before us and for the sole purpose of deciding the pending motions. The following are not specific factual findings with relevance outside of this summary judgment decision. See Blake v. Nationwide Ins. Co., 2006 VT 48, ¶ 21, 180 Vt. 14 (citing Fritzeen v. Trudell Consulting Eng'rs, Inc., 170 Vt. 632, 633 (2000) (mem. op.)).

1. Applicant Jeffrey Nyewide applied to the Town of Manchester Development Review Board ("DRB") for conditional use and site plan approval to develop an "eco-resort" on property he owns. Appellant's Statement of Undisputed Material Facts (Hereinafter "SUMF") 4, 7.

2. Applicant's specific proposed uses for the property include accommodations for overnight guests; a restaurant and other food services; recreational activities for guests (including continuation of an existing on-site falconry school); and hosting weddings, corporate retreats, and other events. Exhibit 5 to Appellant's SUMF at 2-4.

3. Applicant's proposed new and redeveloped structures include 43 new double occupancy "camp shelters" which form the primary lodgings for guests; a new lodge building; renovating an existing farmhouse for further lodging and dining facilities; renovating an existing barn and garage; and several smaller new or existing structures. SUMF at 16, Exh. 5 at 3-5. Total proposed occupancy is 46 double occupancy rooms/shelters, which could house up to 92 persons.

4. Applicant has noted that the proposed camp shelters resemble "tiny house[s]." All camp shelters are proposed to be built on an elevated steel chassis with wheels and no permanent foundations, to be connected to power, water supply and septic systems, and to have enclosed living areas. Exh. 5 at 5.

5. Applicant's proposed existing or new on-site road and trail features include a mix of gravel and pervious paved surfaces. SUMF at 23-27; Permittee/Appellee's Response to Appellants' Statement of Undisputed Material Facts (Hereinafter "Response") at 23-27.

6. Applicant's proposed parking and service areas include a mix of grass and pervious paved surfaces. SUMF & Response at 28.

7. Applicant's engineers provided a stormwater management plan for inclusion with the DRB application. This plan stated that the pervious pavement to be used "cannot take extremely heavy

loads, large sand spreading in winter, or heavy salt use and continue [to] maintain its integrity and environmental friendliness." Applicant's engineer therefore recommends against such activities. SUMF & Response at 21-22; Exhibit 14 to SUMF at 2-3. In a letter submitted to the Act 250 District Commission, however, the same engineer stated that "occasional heavy trucks visiting the site should not damage or impair the functionality of the pervious pavement." SUMF & Response at 21-22; Exhibit B to Response.

8. The property consists of three parcels. *See* Exhibit 15 to SUMF under "General Notes."

9. Cumulatively the three parcels have an area of roughly 53.61 acres. SUMF 7.

10. The property sits mainly in the Rural Agricultural Zoning District ("RA District"), with a small portion in the Forest Conservation Zoning District. SUMF 7. All proposed development, with the exception perhaps of a proposed "Summit Outpost pavilion" is in the RA District. Exhibit 6 to SUMF at SD 101.

11. The entire property sits in Zone B of the Aquifer Protection Overlay Zoning District. Some portions of the property also sit in the Flood Hazard Overlay Zoning District. SUMF 8-9.

12. On October 15, 2020, the DRB issued a decision granting conditional use and site plan approval for the project. As part of this decision, the DRB imposed certain conditions on development. In re Benson Rd. Site Plan & Cond. Use Application, Findings of Fact and Conclusions of Law, Decision, & Order, No. 2020-05-034 (Town of Manchester Dev. Review Bd. Oct. 15, 2020).

13. Notably, the DRB limited dining in the restaurant to the project's lodging guests. Id. at "Decision and Order" ¶ 2.

14. The DRB also placed limitations on the number of events the project could host, stratified by the number of attendees at each event. Thus, the DRB limited the project in its first two years of operation to a maximum of 6 events involving 93 to 150 attendees, a maximum of 6 events involving 150 to 300 attendees, and a maximum of two events with more than 300 attendees. The DRB required the Applicant to secure an event permit from the Town for events with more than 300 attendees. The DRB required the Applicant to re-apply to the DRB after two years for permission to host events with a number of attendees exceeding the occupancy of the project's lodging (92 persons). Id. at "Decision and Order" ¶¶ 3-4.

15. The DRB required the Applicant to reduce a proposed overflow parking area meant primarily to accommodate event attendees not staying at the project's lodging from 77 spaces to 40 spaces. Id. at "Decision and Order" ¶ 7.

16.     The DRB required the Applicant to provide shuttle service to events exceeding 150 attendees for attendees not staying at the project's lodging.  Id. at "Decision and Order" ¶ 5

17.     The DRB required this shuttle service to pick up event attendees lodging off-site but locally from their respective lodgings and required the Applicant to secure an off-site parking lot from which this shuttle service would transport attendees not lodging locally.  Id.

18.     The Applicant has also applied for an Act 250 permit for the project.  The Applicant has revised some features of the proposal as submitted to the DRB in its application for the Act 250 Permit.  Notably, the Applicant has altered slightly the floor plans for the proposed camp shelters, appearing to change their total square footage and the areas both within and outside their footprint that are covered by a canvas canopy.  Response to SUMF at 17; Exhibit A to Response at 1.

19.     Neighbors appealed the DRB's decision to grant a conditional use permit and site plan approval, alleging numerous infirmities with the application and/or Bylaws under which it was approved.

20.     Applicant cross-appealed, contesting only the DRB's condition that he must re-apply after two years for permission to host events with attendees exceeding the occupancy of the project's lodging.

### Discussion

We now consider Neighbors' motion for summary judgment on Questions 1, 2, 3, 5, 11, 13, 14, and 15 of their Statement of Questions.  We review these requests in the numeric order of the referenced Question.

> 1.  *"Should the Application be denied because it does not comply with lot coverage standards of Ordinance § 4.15?"*

Neighbors' argument on Question 1 has two components.  Neighbors first assert that the lot coverage calculation provided by the Applicant is incorrect.  Their second argument is that, employing the correct lot coverage figure, which exceeds the statutory maximum, the Court must deny the application.  Because we find below under Question 2 that the waiver criteria in the ordinance are not void, and that a waiver as to the maximum lot coverage is therefore possible, we conclude that exceeding the maximum lot coverage is not fatal to the application.  Summary judgment is therefore denied Neighbors as to the second part of this Question.

However, to provide clarity to the parties ahead of a possible trial, we will examine below the arguments as to what the applicable regulations require be included in lot coverage calculations. Neighbors argue Applicant's provided lot coverage calculations have the following infirmities: (1) the

-4-

numerator (i.e. the area of the lot that is covered by developed features)[2] does not include the footprints of the proposed 43 camp shelters; (2) the numerator does not include the proposed event tent pad; (3) the numerator does not include undevelopable land; and (4) the Applicant applies a 50% reduction to the area of certain roads and service areas when including them in the numerator, based on the permeability of the asphalt surface, which permeability would be disrupted or destroyed by the heavy vehicle traffic and/or sanding and salting Applicant has planned for it. We consider each argument in turn.

> i.   *Whether the area beneath the proposed camp shelters must be included in the lot coverage numerator*

The Town of Manchester Land Use & Development Ordinance ("Ordinance" or "Bylaws")[3] defines "Lot Coverage" as follows:

> The area of a lot (expressed as a percentage of total lot area) that is covered by developed features, including structures, buildings, accessory structures, parking areas, loading areas, service areas, swimming pools, paved recreational courts, sidewalks, pathways, driveways, roads, storage areas for personal property, exterior display areas for merchandise. Areas covered by permeable pavement and decks and boardwalks may be counted at 50% if installed over a reservoir layer to treat and retain stormwater infiltration. Lot coverage includes that portion of a lot that is not covered with woody or herbaceous plantings or mulch materials.

Bylaws § 13.13.

Both sides accept that the camp shelters would fall under the definition of "permanent structures" in §13.20, because they are connected to power, water, and wastewater utility lines. Neighbors argue that the definition of lot coverage includes all areas covered by structures in the

---

[2] Applicant correctly points out that as a ratio, lot coverage involves both a numerator (area of lot covered) and a denominator (total area of lot minus any exclusions), and to be precise, one should clarify whether a particular area is included in the lot coverage numerator, denominator, or both. Unfortunately, the town Bylaws do not always include this level of precision. In the first sentence of the definition, it is clear that all of the list of developed features are to be included in both the numerator and denominator, because of the phrase "expressed as a percentage of total lot area." It is also clear that when the ordinance uses the phrase "lot coverage" without qualification, it means as a percentage of total lot area. The last sentence of the definition—"Lot coverage includes that portion of a lot that is not covered with woody or herbaceous plantings or mulch materials"—is less clear as to what it refers to, but we conclude the reference to "portion" makes clear enough that this also means such areas are included in both the numerator and denominator. However, section 6.23.3, which states that "Class A undevelopable land will be included when calculating the maximum residential density, lot coverage, or building coverage on a lot, unless excluded elsewhere in this ordinance" is not on its face as clear. Nevertheless, as explained in the operative text below, we agree with Applicant that the sensible construction is to view this sentence as a directive to include such undevelopable land only in the denominator, not in the numerator, for such calculations.

[3] All citations to the Bylaws are to those effective June 19, 2018, submitted as Exhibit 2 to Neighbors' Motion. It is not disputed that this is the version of the Bylaws that govern this application.

numerator. They assert that the land beneath the camp shelters is "covered by" them and should therefore be in the numerator. Applicant contends that the ordinance expressly excludes areas covered by mulch from the lot coverage numerator. The cabins will be elevated off the ground and the ground beneath them covered in mulch, and so, he argues, their footprint is properly excluded from the lot coverage numerator.

Resolving this issue requires us to determine the meaning of "covered by" in the first sentence of the lot coverage definition and the meaning of the final sentence of that definition. In interpreting zoning ordinances, we apply principles of statutory construction and we "construe words according to their plain and ordinary meaning, giving effect to the whole and every part of the ordinance." In re Appeal of Trahan, 2008 VT 90, ¶ 19, 184 Vt. 262. If there is no plain meaning, we will "attempt to discern the intent from other sources without being limited by an isolated sentence." In re Stowe Club Highlands, 164 Vt. 272, 280 (1995). In construing ordinance language, our "paramount goal" is to implement the intent of its drafters. Colwell v. Allstate Ins. Co., 2003 VT 5, ¶ 7, 175 Vt. 61. We therefore "adopt a construction that implements the ordinance's legislative purpose and, in any event, will apply common sense." In re Laberge Moto-Cross Track, 2011 VT 1, ¶ 8, 189 Vt. 578 (quotations omitted).

We first address the following question: For an area to be "covered" by a structure (or other developed feature), is it enough for the structure to be in the airspace directly above the ground area—or must the entire perimeter and/or floor of the structure be in contact with the ground, thereby enclosing the area? The Bylaws do not define the word "cover" so we are left to rely on the ordinary understanding of the term. The transitive verb cover is given many definitions, including "To place something on or over, so as to protect or conceal," "to overlay or spread with something"; and "to extend over." Webster's II New College Dictionary, cover (3rd ed. 2005). The consistent quintessential feature of "cover" according to these definitions is that it exists over another thing, in some way blocking the thing (from sight, from the elements, etc.). The camp shelters will have impervious roofs and floors. By the ordinary meaning of "cover," we conclude that slightly elevated camp shelters cover the ground beneath them.

Applicant argues, however, that the final sentence of the "Lot Coverage" definition nevertheless indicates that if a layer of mulch lies between the floor of an elevated structure and the ground, the footprint should not be included in the lot cover numerator. We note first that on one plain text reading of the ordinance, Applicant's restatement of the final sentence is simply wrong. The

sentence states that lot coverage includes areas not covered in mulch; Applicant restates this as "lot coverage does not include areas covered in mulch." This is a false contrapositive.

But that is not the end of our analysis. It may not be correct to literally interpret this final sentence as a strict conditional statement (and Applicant's interpretation as a false contrapositive), especially when the sentence is read, as it must be, in the context of the entire definition of lot coverage. *See* In re Appeal of Trahan, 2008 VT 90, ¶ 19. Notably, viewing the sentence as a strict conditional would lead to absurd results. Even if one construed "woody or herbaceous plantings" to include naturally sewn or regenerated plants as well as ones planted by people, the strict conditional interpretation would still lead to rivers, ponds, and rocky outcrops, which are not covered in plantings or mulch, being included in the lot coverage numerator. These are not the sorts of "developed features" that the first sentence of the definition indicates should be considered as part of lot coverage. We therefore consider other interpretations. *See* Springfield Terminal Ry. Co. v. Agency of Transp., 174 Vt. 341, 348 (2002) ("This Court will always avoid a statutory construction which leads to absurd or irrational results.").

Neighbors agree with Applicant that the final sentence should be read to *exclude* certain areas from the lot coverage calculation, but argue that the sentence refers exclusively to gardens or other landscaped areas, which feature "woody or herbaceous plantings or mulch materials." Reply at 4. They suggest that the drafters of the ordinance may have felt a need to clarify that such areas, which might be deemed "developed features," should nevertheless be excluded from the lot coverage numerator. However, they argue that mulched areas beneath cabin shelters are not gardens and so must be included in lot coverage.

We believe Neighbors' interpretation best harmonizes the entire definition of "lot coverage" contained in the Bylaws and is an acceptable plain-text reading of the final sentence. Their interpretation is also buttressed by looking at the available clues as to the purpose of the lot coverage standard in the town ordinances. The section establishing dimensional standards doesn't explicitly state the purpose of the lot coverage requirement. However, as mentioned, the definition of lot coverage allows developers to count areas covered by pavement, decks, and boardwalks at only 50% of what they would otherwise be counted, if the pavement, decks, or boardwalks are permeable and installed over a reservoir layer to "treat and retain stormwater infiltration." This suggests that a primary concern in lot coverage is allowing surface water to infiltrate the ground and be filtered before reaching the groundwater table. Notably, also, given the discussion of elevated structures, many boardwalks or decks are elevated, and yet they are still counted towards lot coverage. It is their

permeability, not their elevation, that entitles them to a partial reduction to their lot coverage contribution.

The performance standards for the Aquifer Protection Overlay district that includes the property are also instructive. Section 5.2.6(3) of those standards requires that developments other than one- or two-family dwellings, which render more than 20% of lot area impervious, demonstrate that any increased runoff will be recharged on site and diverted to areas with vegetation for surface infiltration wherever possible, and that in any event, no development shall render more than 50% of total lot area impervious. Section 5.2.6(4) requires developments other than one- or two-family dwellings to either keep more than 30% of the lot area in its "natural vegetative state" or to "demonstrate that such removal of vegetative cover shall not result in decreased recharge of the ground water deposit, or increased sedimentation of surface waters." While this latter performance standard concerns the percentage of the lot covered in natural vegetative cover, that figure is inversely related to lot coverage.

Together, these two sections strongly support the idea that especially in the Aquifer Overlay District, the town's purposes in regulating maximum lot coverage include principally ensuring groundwater filtration and recharge and preventing erosion. Gardens and other landscaped areas allow for groundwater recharge and can help prevent erosion. In contrast, the camp shelters—regardless of their slight elevation or whether mulch is placed beneath them—redirect precipitation away from their footprints. They thereby reduce groundwater recharge in the area beneath them and increase the potential for erosion on slopes. The plain meaning of the statute, read in light of the available evidence as to legislative purposes, supports including the areas beneath camp shelters within the lot coverage numerator, regardless of whether that area is covered by mulch.

Lastly, we note in passing that the DRB clearly thought that the camp shelters should be included in lot coverage, or at least that they were included in the figures provided to them. Paragraph 73 of the DRB decision states "much of the proposed lot coverage is in the form of very small structures designed to be scattered throughout the wooded acreage of the site." The DRB is almost certainly referring here to the camp shelters. This conclusion is bolstered by the next sentence's reference to "related elements of the proposed resort (housekeeping sheds and cart paths)." The housekeeping sheds and cart paths are both related to the camp shelters in that they support their maintenance and use. While we make our own findings of fact and conclusions of law in a de novo appeal, we do grant some deference to a DRB's interpretation of its own Bylaws where reasonable and consistent. In re Champlain Coll. Maple St. Dormitory, 2009 VT 55, ¶ 10, 186 Vt. 313; *see also* In

re Korbet, 2005 VT 7, ¶ 10, 178 Vt. 459. Given that it's less than clear whether the DRB in the quoted passage was merely relaying its (mistaken) impression that Applicant included the camp shelters in the lot coverage area calculation provided to the DRB or affirmatively concluding that the shelters should be included in lot coverage, the above passage has no weight in our finding.

We conclude that the cabin shelters' footprint should be included in the project's calculated lot coverage. The square footage of their proposed footprint is still a contested issue of fact, which must be resolved at trial.

*ii. Whether the event tent pad area should be included in the lot coverage numerator*

Neighbors next argue that the area designated on the site plan as the event tent pad site must also be included in the lot coverage numerator. They point to the statute's reference to "structures" without any qualification in defining lot coverage. They note that the ordinance elsewhere separately defines "structure," "permanent structure," and "temporary structure." Citing a familiar rule of statutory construction, they argue that these separate definitions demonstrate that the Bylaws' drafters knew how to differentiate between permanent and temporary structures but chose not to do so in the lot coverage definition. Therefore, they argue, the drafters intended that the area beneath all structures, be they permanent or temporary, would be included in lot coverage calculations.

Applicant argues that Neighbors' interpretation does not accord with the plain meaning or purpose of the ordinance and produces absurd results. He admits that an event tent appears to fall within the statute's definition of temporary structure. However, he notes that the quintessential characteristic of the listed developed features included in lot coverage is that they are permanently affixed to and covering the land. He also notes that while placing temporary structures not related to construction on one's property generally requires a permit under § 6.21 of the Ordinance, a prominent exception is tent structures that remain in place for less than one week. He suggests this supports excluding such temporary tents from lot coverage. Finally, he claims that Neighbors' interpretation leads to the absurd result that all permittees must forecast areas of the property where they anticipate ever erecting a temporary structure, be it a wedding canopy or a camping tent, and include that area within lot coverage.

While Neighbors may be right as to their interpretation of the word "structures," they neglect the phrase "the area that is covered by" that precedes it. The use of the present tense and the word "is" without qualifications supports a reading limiting what follows to permanent developed features. Similarly, setting aside the word "structures" in this list, as that is the very focus of the dispute, we tend to agree with Applicant that the examples of developed features given in the lot coverage

definition are all permanently affixed to the land, except perhaps for exterior display areas for merchandise. Applicant's reductio ad absurdum argument is also effective as far as it goes.

Despite those points in Applicant's favor, we are not yet sure that Neighbors' interpretation is absurd as it relates to the proposed event tent pad. The site of the tent pad is already known and marked on the site plan, distinguishing it from the examples Applicant gives. Further, a sturdy, impermeable event tent erected at regular intervals of several days each, and potentially housing a dance floor, tables, or chairs, may be much closer to a permanent structure than a camping tent, especially in its impacts on the environmental concerns implicated in lot coverage requirements. Much will depend on the total number of days in a year that the event tent is likely to remain erected, and what effect the tent and the activities beneath it are likely to have on the permeability of the ground. The fact that one week is the duration beyond which a permit is required for a temporary tent is helpful context but not controlling for the analysis of whether the event tent pad should be included in the proposed lot coverage for this project. We reserve judgment on whether the event tent pad must be included in the lot coverage numerator until these issues of fact are further developed.

### iii.    Whether undevelopable land should be included in the lot coverage numerator

Neighbors claim certain undevelopable land on the site must be included in the lot coverage numerator, pointing to Bylaws § 6.23.3[4], which states that "Class A undevelopable land will be included when calculating the maximum residential density, lot coverage, or building coverage on a lot, unless excluded elsewhere in this ordinance." Applicant, however, interprets this statutory language as a directive to include such land in the *denominator* in the referenced dimensional standards, unless elsewhere excluded.

Applicant's interpretation better reflects the plain meaning of the statute's words in light of its overall purposes. Here, the word "maximum" clearly modifies each of the terms that follows: residential density, lot coverage, and building coverage. *See* Kalakowski v. John A. Russell Corp., 137 Vt. 219, 224, 401 A.2d 906, 909 (1979) ("When words of a statute bearing a specific description are followed by words of more general import, the sense of the adjective first used is applied to the words that follow."). "Calculating the maximum" for each of these standards is a matter of determining how large the denominator is, not the numerator. This is a clear signal that the statute here means to include such land in the denominator. The legislative purposes for establishing maximum lot coverage

---

[4] The Bylaws contain two sections labeled 6.23.3. This citation is to the second section so labeled.

discussed earlier support this interpretation. Undevelopable land, which includes wetlands, is frequently ideal territory for groundwater infiltration and recharge. It would not accord with the legislative purposes to count such land against the limited allowed area in which groundwater infiltration and recharge is prevented by development.

> *iv.* *Whether the planned paved areas are properly given a 50% discount when included in the lot coverage numerator, given possible impairment of their permeability by planned traffic and ice and snow removal.*

Neighbors have conceded that genuine disputes of material fact exist as to this sub-question. Appellants' Reply at 5. We therefore deny summary judgment as to this sub-question and await the evidence presented at trial so that the Court may be in a position to assess the parties' competing factual assertions.

For the reasons stated above, we **GRANT** Neighbors' motion for summary judgment in part on Question 1 insofar as we rule that, as a matter of law, the footprints of the cabin shelters should be included in the proposed lot coverage calculation. Neighbors' motion is **DENIED** insofar as we rule that, as a matter of law, undevelopable land on this property is to be included in the lot coverage denominator and not the numerator. It is further **DENIED** in that we conclude there remain genuine disputes of material fact that affect whether the tent pad should be counted in the lot coverage numerator and whether the paved areas should be allowed to be counted at 50% of their actual area. Finally, it is **DENIED** as to the question of whether exceeding the maximum lot coverage for this lot would, alone, be sufficient to deny the application.

The remaining points of contention about whether this property should be deemed one lot or three lots for purposes of determining the maximum lot coverage—and if it is three lots, whether it is at all relevant, as the DRB determined it was, that the Applicant could administratively complete a boundary line adjustment to increase the maximum possible lot coverage across the project area— remain to be resolved at trial, given the factual disputes that currently exist.

> *2. "Should Applicant's lot coverage waiver request be denied pursuant to Ordinance § 3.6?"*

Neighbors divide their arguments on Question 2 into two parts. First, they argue that the waiver criteria in the Town's Ordinance (Figure 3-1) are either ultra vires or unconstitutionally vague. Second, they argue that even if the waiver criteria are constitutional, Applicant's proposed project does not satisfy them. Neighbors' argument that the Ordinance is ultra vires has two further sub-parts: first, they argue that the enabling statute requires waiver criteria to contain "specific standards"; Neighbors assert that the Town's criteria are not specific enough. Second, they note that the enabling

statute permits only "waivers to *reduce* dimensional requirements," 24 V.S.A. § 4414(8)(A). They interpret this to mean that waivers may lead only to a smaller ultimate dimensional standard. Thus, they claim, to interpret the Town's waiver criteria to allow a larger percentage of a lot to be covered would make the criteria ultra vires. Neighbors' argument that the criteria are unconstitutional also turns on their alleged lack of specificity. Citing to In re Appeal of JAM Golf LLC, 2008 VT 110, 185 Vt. 201, Neighbors argue that this lack of specificity makes the criteria essentially standardless and thereby violate landowners' due process rights by failing to provide adequate guidance to landowners and those charged with interpreting the ordinance.

Applicant counters that the criteria are sufficiently specific to pass statutory and constitutional muster. He cites to our decision in In re Carrigan Waiver and Variance Applications in support. He contests Neighbors' interpretation of what "reduc[ing] dimensional requirements" means, pointing out that when a dimensional standard is couched as a maximum limit, a waiver seeker necessarily seeks to exceed that limit, and Neighbors' interpretation would exclude all such requests.

On this latter point, Applicant is plainly correct. Interpreting the plain meaning of the text in light of the legislative purposes, to "reduce" a dimensional requirement means to ease that requirement. If the standard is a maximum, "reduce" means to allow the project to exceed that maximum; if the standard is a minimum, "reduce" means to allow the project to fall below that minimum. Ruling out half of this logical operation when a plain meaning interpretation does not so require makes no sense to this Court. *See* Springfield Terminal Ry. Co. v. Agency of Transp., 174 Vt. 341, 348 (2002) ("This Court will always avoid a statutory construction which leads to absurd or irrational results.").

Although it is a closer call, we also conclude that Neighbors have not demonstrated that they are entitled to summary judgment as to whether the waiver criteria are void for vagueness. Our decision in In re Carrigan did not address the constitutional validity of the challenged waiver provisions, although Applicant is correct that we found that the waiver provisions at issue there did satisfy the statutory requirements then contained at 24 VSA § 4418, making the decision helpful guidance for the first part of Neighbors' claim. *See* In re Carrigan Waiver and Variance Applications, No. 38-2-10 Vtec, slip op. at 10-11 (Vt. Super. Ct. Envtl. Div. Jan. 13, 2011) (Wright, J.).

Neighbors specifically point to the Town's waiver criterion 3, which allows a waiver if the proposed land development is beneficial *or* necessary for the continued reasonable use of the property. They argue that all landowners believe their proposed projects are beneficial for the reasonable use of their property, meaning this criterion could never support denying a waiver. They also claim that

-12-

Criterion 2, which allows a waiver if "the proposed development will not substantially or permanently impair the lawful use or development of adjacent property" is standardless because it "does not specify how much impairment is too much." Finally, they claim that by not indicating the extent to which the normal lot coverage maximum may be exceeded, the town ordinances are again fatally unspecific.

In deciding the validity of these waiver criteria, we are mindful of the Supreme Court caution to "review[] zoning ordinances narrowly, overturning only those that are clearly unreasonable, irrational, arbitrary, or discriminatory." In re Snyder Group, Inc., 2020 VT 15, ¶ 15, 212 Vt. 168 (quoting In re White, 155 Vt. 612, 617 (1990)). We are also mindful of our charge to resolve ambiguity in zoning laws, which are in derogation of common law property rights, in favor of the landowner. Appeal of Weeks, 167 Vt. 551, 555-56 (1998). We note that "[t]he test for vagueness is less strict when applied to regulations that affect economic interests, not constitutional rights," In re Snyder Group, Inc. 2020 VT 15, ¶ 25, and that "to succeed on a facial challenge, neighbors would have to demonstrate that the bylaw is impermissibly vague in all its applications." Id. at ¶ 27 (internal quotation marks omitted).

We conclude that as in In re Snyder Group, the facts here are distinguishable from In re Appeal of JAM Golf because the waiver criteria provide "sufficient conditions and safeguards to guide applicants and decisionmakers." In re Snyder Group, 2020 VT 15, ¶ 28. Regarding criterion 1, Neighbors are wrong to suggest this is a subjective standard, to be viewed from the perspective of the landowner. Rather, the DRB must decide for itself what constitutes continued reasonable use of the property and whether the proposed land development is beneficial or necessary for such use. Admittedly, this is still a broad standard and grants a quantum of discretion to the DRB. But even if we struck this criterion after trial and full briefing, the remaining criteria provide sufficient guidance to pass statutory and constitutional muster.

Regarding criterion 2, Applicant is correct that we upheld a criterion essentially identical to this one in In re Carrigan Waiver and Variance Applications. *See* No. 38-2-10 Vtec, slip op. at 10 (Jan. 13, 2011). Neighbors have made no attempt to distinguish this case from In re Carrigan. More importantly, the fact that "impairment" is not a concept that lends itself to quantification does not mean that prohibiting substantial or permanent impairment is essentially standardless. *See* In re LaBerge NOV, 2016 VT 99, ¶¶ 23-25, 203 Vt. 98 (declining to find void for vagueness a municipal noise ordinance that relied on a reasonableness criterion and factors of intensity, duration, and frequency); *see also* Grayned v. City of Rockford, 408 U.S. 104, 110 (1972) ("Condemned to the use of words, we can never expect mathematical certainty from our language."). Significantly, "substantial[]

-13-

or permanent[] impair[ment]" of neighboring property is a test required in the enabling statute itself, albeit in the standards for a decision-maker to employ when considering a requested variance. *See* 24 V.S.A. § 4469(a)(4). That test for considering variances, in the enabling statute and as enacted into municipal bylaws, has been consistently applied for many years without being found constitutionally infirm. *See, e.g.* L.M. Pike & Son, Inc. v. Town of Waterford, 130 Vt. 432, 437 (1972); In re Bailey, No. 2006-192, 2006 WL 5838205, at *4 (Vt. Nov. 2006) (unpublished mem.).

Finally, concerning the lack of a quantified upper bound on permissible waivers, we make several observations. First, the enabling statute does not explicitly require such upper bounds. Neighbors' attempt to read such a requirement into the phrase "in accordance with specific standards" is unconvincing. Second, most if not all of the dimensional standards from which waivers may be sought differ from one zoning district to the next. It is understandable, given the goal of promoting development appropriate to each district, why the town would not then elect to provide one quantitative figure—even in relative, rather than absolute terms—of how much of a lot coverage waiver could be granted. Finally, the town's waiver criteria, in addition to governing when a waiver may be granted, act ineluctably to determine how much of a waiver may be granted. Rather than creating a fixed quantified limit on waivers for dimensional standards other than residential density, the Town has elected to provide guidance to landowners and those charged with interpreting the ordinance via substantive criteria.

Neighbors' facial constitutional challenge to the Town's waiver criteria has not met its high bar for success. Nor is their statutory challenge successful. In the alternative, Neighbors argue that the proposed project does not meet the waiver criteria. We agree with Applicant that this is an extremely fact intensive inquiry and it would be inappropriate to grant Neighbors summary judgment on this question given the existence of disputes about material facts. We therefore **DENY** Neighbors' motion for summary judgment on Question 2 and await the evidence to be presented at trial.

   3. *"Should the Application be denied because it does not comply with wastewater requirements of Ordinance § 5.2.6(1)?"*

Applicant has proposed using an on-site wastewater treatment system to fulfill all of the project's wastewater treatment needs. While wastewater system permitting is generally governed by state law, these systems may be relevant in municipal land use review as well. In reviewing the application, the DRB noted a seeming conflict between two provisions of the town Bylaws that govern wastewater treatment systems in the Aquifer Protection Overlay ("APO") District. The APO district is currently divided into two zones and the project falls entirely in Zone B. Bylaws § 5.2.3(8) forbids

on-site wastewater disposal systems or treatment facilities in Zone A of the APO, but allows them as a conditional use in Zone B, to the extent permitted in the underlying zoning district. However, § 5.2.6(1) requires that all new developments in the APO be connected to the Town of Manchester sewer system, seemingly precluding the use of on-site wastewater treatment and disposal systems, even in Zone B.

In reconciling these two provisions, the DRB noted first that the enumerated purpose for the APO District regulations in the Bylaws is to "protect public health and safety by preventing contamination, promoting recharge and maintaining the supply of community groundwater drinking water sources within the town." DRB Decision, & Order at ¶ 42 ; Bylaws § 5.2.1. The DRB then observed that Zone A of the APO is composed of Zones 1 and 2 of Manchester's state-mandated water system Source Protection Plan (SPP) and Zone B of the APO mirrors Zone 3 of the SPP. Of the three zones required by the state, Zone 3 is where impacts to the local drinking water source, while potential, are deemed least likely to occur. Looking to legislative history, the DRB noted that prior to 2018, Zone B did not exist and the area within it was not part of the APO. The 2017 town plan, however, mentioned that the Town was "currently considering new ordinance provisions that would include the entire mapped wellhead protection area in an Aquifer Protection Overlay (APO) district, but would conditionally allow some uses within zone 3 that would continue to be prohibited in Zones 1 and 2." These changes came through amendments in 2018 that made wastewater treatment systems, among other uses, a conditional use in Zone B. The DRB also noted that the 2018 amendments prohibited certain uses throughout the APO at § 5.2.5, but included wastewater treatment systems instead in § 5.2.4, which lists uses that could be conditionally permitted in Zone B.

In light of the above observations, the DRB concluded that after 2018, the language in § 5.2.6(1) continuing to require new developments throughout the APO to connect to the town sewer system represented an oversight by the drafters of the 2018 amendments. It determined that the statutory construction that best makes sense of the legislative purpose (considering this legislative history) is that § 5.2.3(8) presents a narrow exemption to § 5.2.6(1). In other words, the DRB concluded that it had the power to allow on-site wastewater treatment systems in Zone B, and to impose conditions to ensure those systems satisfied all state and federal permits and water protection precautions.

Neighbors argue that the DRB was wrong and that § 5.2.6(1) controls. Under their interpretation, any new development in the APO district, even in Zone B, must connect to the town sewer system rather than utilizing an on-site wastewater treatment system. They make several

arguments in support. First, they claim that there is no actual conflict between the two provisions, at least not after an attempt to read them in harmony with each other. Therefore, they argue, under such cases as In re 204 N. Ave., 2019 VT 52 ¶ 5, the decision-maker cannot resort to legislative history, as the plain meaning of the text is unambiguous. Reply at 8. They say that the DRB's interpretation impermissibly reads 5.2.6(1) out of the ordinance. They also note the rule of statutory construction that a specific statute dealing with certain subject matter governs over a more general one dealing with that subject matter. They argue that § 5.2.6(1), which requires only 'new developments' to connect to the town sewers, is more specific than § 5.2.3 which deals with all developments. Their argument implies that their interpretation prevents § 5.2.3(8) from being rendered total surplusage, because the DRB could still approve, under conditional use criteria, on-site wastewater systems that are not part of a *new* development. Finally, they claim their interpretation best accords with the town's policies underlying the APO, since a connection to the town sewer system is less likely to cause impacts to the aquifer than an on-site wastewater system.

For his part, Applicant argues that § 5.2.3, which allows certain uses as conditional uses only in Zone B, is more specific than § 5.2.6, which applies to the entirety of the APO. He supports the DRB's interpretation that the legacy language in § 5.2.6(1) requiring connection to the town sewers, as applied to properties in the new Zone B, is a legislative oversight. He contends allowing such systems in Zone B, where impacts to the groundwater system are less likely, is consistent with the purposes of the APO. His argument implies that § 5.2.6(1) would not be rendered total surplusage under the urged interpretation, as it would continue to apply to new developments in Zone A, though not in Zone B.

In interpreting the plain meaning of zoning bylaws in light of legislative purposes, we attempt to "giv[e] effect to the whole and every part of the ordinance." In re Appeal of Trahan, 2008 VT 90, ¶ 19. In other words, we consider the entire statutory scheme and seek to avoid rendering any part of the statute as pure surplusage. Trombley v. Bellows Falls Union High Sch. Dist. No. 27, 160 Vt. 101, 104 (1993). Further, we seek "to harmonize statutes and not find conflict if possible." Athens Sch. Dist. v. Vermont State Bd. of Educ., 2020 VT 52, ¶ 30. If it is not possible to harmonize the statute, one way to resolve conflict is to by giving specific and more recent statutes regarding the same subject matter precedence over more general and older statutes. Id.

First, we disagree with Neighbors that there is no conflict between the two provisions and that the statute unambiguously expresses its intent, making resort to tools of statutory construction inappropriate. We do see an apparent conflict between the two provisions: one requires new

-16-

developments in the APO District to connect to the town sewer system, while the other allows those developments to rely instead on on-site wastewater systems. Neighbors claim that § 5.2.6(1) is the more specific of the two provisions and therefore controls in case of conflict, because it only applies to new developments, while § 5.2.3 applies to all developments. However, § 5.2.3 by its terms allows certain conditional uses only in Zone B. It is not clear on their face which rule is more "specific": the one applying only to new developments or the one applying only in a sub-zone of the APO District. What's more, the section of the statute allowing wastewater systems in zone B is the more recently enacted of the two. If anything, then, this canon favors Applicant.

The rule against surplusage also favors Applicant. Given the Bylaws' customarily broad definition of "development," only rarely, if ever, would the DRB have occasion to conduct conditional use review for an on-site wastewater system *not* tied to a "new development." Typically, a property owner with a wastewater system that predated the Bylaws' requirement to obtain conditional use approval would not seek approval for that system absent a new development. Instead, the property owner would rely on their ability to continue using that system as a lawful pre-existing non-conforming use. Expansion or change of a non-conforming use are two situations when a DRB might typically deal with applications for conditional use approval not tied to new development, however section § 5.2.5 governs those scenarios in the APO, and if any additional wastewater is to be created by the expansion, § 5.2.5 requires connection to the town sewer. It is therefore hard to see how Neighbors' interpretation would not render § 5.2.3(8) almost entirely as surplusage, since it leaves approval for expansion of a non-conforming use that does *not* create additional wastewater as perhaps the only scenario in which § 5.2.3(8) would apply. In contrast, the interpretation urged by the Applicant and adopted by the DRB leaves § 5.2.6(1) intact as it applies to new developments in Zone A of the APO, which is the portion of the APO where impacts to the town's drinking water are more likely to occur and where the use of on-site wastewater disposal is therefore riskier. Applicant's interpretation therefore creates less surplusage than Neighbors' interpretation. The interpretation offered by Applicant is also largely in keeping with the expressed legislative purposes for creating the APO. Finally, given the ambiguity, we believe resort to legislative history is appropriate and find the DRB's analysis compelling in this regard.

Further, although we conduct our review de novo, we grant some deference to the DRB's interpretation of the Bylaws where it is reasonable and has been applied consistently. In re Champlain Coll. Maple St. Dormitory, 2009 VT 55, ¶ 10, 186 Vt. 313; *see also* In re Korbet, 2005 VT 7, ¶ 10, 178 Vt. 459. The DRB interpretation here is certainly reasonable and supported by argumentation. We

will request further briefing ahead of a possible trial as to whether the DRB has previously or since interpreted these provisions or related provisions in the Bylaws.

Neighbors have not met their burden to prove they are entitled at this time to judgment as a matter of law as to whether connection to the town sewer system is required for the project. Therefore, summary judgment is **DENIED** to Neighbors as to Question 3.

> 5. *"Should the Application be denied because it proposes development on undevelopable land in violation of Ordinance § 6.23?"*

Neighbors claim that according to the Natural Resources Atlas, prepared by the Vermont Agency of Natural Resources, a portion of the eastern side of the property contains slopes of more than 20%. Under the Bylaws, land of such steep slopes is "undevelopable" regardless of what is otherwise permitted in an underlying district. Bylaws §§ 6.23.2 and 6.23.3(1). Neighbors further point to Applicant's site plan to allege that the proposed "outpost pavilion" will fall in the area with slopes over 20%. For his part, Applicant disputes Neighbors' reliance on the ANR Atlas as not being evidence established by an engineer, surveyor, or other competent witness. He also claims that the site plan demonstrates that the building in question falls within a relatively flat stretch of ground, even if the surrounding area may contain slopes more than 20%.

We conclude that Applicant has produced sufficient evidence to generate a dispute as to a material fact about whether the proposed pavilion is sited in undevelopable land. We note further that even if it turns out the proposed pavilion is sited in undevelopable land, that would not be grounds to deny the application but merely to impose a condition that requires moving the pavilion. For these reasons, summary judgment to Neighbors is **DENIED** as to Question 5. However, we note that Applicant does not appear to have included a calculation of area of undevelopable land in the site plan provided to the DRB, despite the clear requirement of Bylaws § 2.3.1(7)(b) to do so. At trial, Applicant will bear the initial burden of production and the ultimate burden to persuade the Court that no development is proposed on undevelopable land. Meeting the initial burden will require Applicant to present the Court with a calculation of undevelopable land area and a map indicating such areas in relation to proposed developments.

> 11. *"Should the Application be denied because it does not comply with parking requirements of Ordinance § 9.6?"*

Neighbors argue that because Applicant's permit proposal includes events with a larger number of attendees than on-site parking can accommodate, the ordinance required Applicant to submit a plan for cooperative off-site parking with his application. Although their question literally

-18-

asks whether the entire application should be denied on this ground, in their memorandum they request that the Court either deny Applicant permission to host events with more guests than on-site parking can accommodate or require that Applicant submit a cooperative off-site parking plan before any such events. We conclude that the issue of whether off-site parking plans must be submitted with a project application under the Bylaws is intrinsic to Question 11. *See* Midway Charters Ventures, LLC, No. 41-3-19 Vtec, slip op. at 6 (Vt. Super. Ct. Envtl. Div. Aug. 29, 2019) (Durkin, J.) (noting that our Court's scope of review in a de novo appeal is limited by the Statement of Questions but includes issues intrinsic to those questions) (citing In re LaBerge NOV, 2016 VT 99, ¶ 15).

For his part, Applicant disputes that the Bylaws require him to submit cooperative off-site parking plans for larger events as part of his application for the overall project. He notes that the DRB decision requires him to develop such arrangements on an ad-hoc basis for larger events and argues that this condition satisfies the Bylaws.

One of the requirements for site plan approval is that "all development must provide off-street parking" in accordance with certain minima and maxima. § 9.6.4. Baseline parking requirements are established for many non-residential uses. Although a resort is not among those uses, the minimum requirement for a hotel is one parking space per room plus one additional parking space per 500 square feet of public meeting area.[5] For a place of public assembly, the requirement is one space per four seats. Bylaws Fig. 9.3. An applicant may, however, seek a modification to the minimum amount of required on-site parking, including by "meet[ing] the requirements for shared parking in Section 9.6.5." Bylaws § 9.6.4(4)(b).

In turn, § 9.6.5 provides that the DRB "may approve a cooperative parking plan to allow parking to be shared by two or more uses or to be provided off-site." The plan must provide for a minimum quantum of total parking shared by the two uses or properties, in accordance with a formula. Further, a shuttle service must be provided for any shared off-site parking more than 1000 feet from the associated use. Additionally, "for shared parking arrangements involving multiple properties, the Applicant must record a written agreement between the owners and lessees, executed for a minimum of 10 years, in the town's land records." Finally, "the Applicant must submit plans showing the location of the use(s) or structure(s) for which shared or off-site parking will be provided, the location

---

[5] As discussed below at question 14, applying the requirements for hotel parking to the project does not indicate that the project should be viewed as a hotel use rather than a resort use but merely that this is the most similar use description found in the parking requirements table.

of the parking, and the schedule of times used by those sharing in the parking." Bylaws §§ 9.6.5(1)-(4).

The plain language of the statute requires the Applicant to submit off-site parking plans at the time of a permit application and the DRB to review them at that time; if in conformance with the ordinance requirements, the DRB is directed to approve the off-site parking plan. Bylaws § 9.6.4(4)(b) explicitly states as much: "The Applicant must provide any combination of the following *in order for the Development Review Board to make a decision*…[a demonstration that] The Applicant meets requirements for shared parking in Section 9.6.5." (emphasis added). Section 9.6.5(4) also uses the present tense without qualification: "the Applicant must submit plans" as to off-site parking. This is consistent with the tense used to describe other requirements that must be fulfilled at the time of application. *See, e.g.*, Bylaws § 2.3 ("All applicants for a zoning permit must submit a site development plan."). Lastly, the provisions for site plan approval are also instructive. One purpose of site plan review is "to ensure that…streets, access, driveways, parking facilities, utilities and other infrastructure, both on-site *and off-site* are adequate and available to support the proposed land development." § 3.2.2(4) (emphasis added). And "[t]o approve a site plan application, the DRB must conclude that the proposed land development meets all of the applicable criteria specified in Section 9." § 3.2.4. The explicit reference to off-site parking, the requirement that the DRB conclude all relevant criteria are met before approving a site plan, and the notice and hearing procedures that give the public the opportunity to contribute input to each type of review conducted by the DRB, all demonstrate a clear legislative intent: any proposed development that will require off-site parking must submit a plan for such parking with its application.

It seems an open question at this stage which allowed use in Bylaws Fig. 9.3 best approximates the property's use to host weddings and other large events, and therefore what the minimum amount of required parking is.[6] However, it is undisputed that at some level of planned attendance within what is currently envisioned, these events will exceed the on-site parking available at the property. Therefore, the property will need off-site parking arrangements for these events.

---

[6] Without explaining how it reached these numbers, the DRB concluded that the minimum required parking for normal operations of the project's lodging and existing falconry school was 57 spaces, which the Applicant's plans exceeded. It concluded that an additional 40 on-site spaces would be required for events from 93-150 attendees. It concurred with Applicant that a shuttle service for events with more than 150 attendees was necessary.

Thus, we **PARTIALLY GRANT** summary judgment to Neighbors on Question 11. We conclude that Applicant must submit his specific plans for off-site parking for large events if he continues to seek approval for hosting such events as part of this application. When the case proceeds to trial, we will request additional briefing from the parties as to the Bylaws provision that establishes the required number of spaces for weddings hosted at the property. To the extent that the original question asks whether the lack of such plans at present requires us to withhold conditional use or site plan approval for the rest of the project, excluding large events, we **DENY** summary judgment.

> *13. "Is the inclusion of "Resort" as a conditional use in the RA district in Ordinance § 4.14 invalid because it fails to conform with the Town Plan pursuant to 24 V.S.A. §§ 4401 and 4410?"*

In this Question as posed, Neighbors attack not the project itself but the Bylaws under which it was approved. But in their briefing, Neighbors refer exclusively to features of the proposed project, rather than to resorts in general. Chiefly, they argue that the project's proposed facilities do not conform to what they characterize as the agriculture and working lands purpose of the Rural Agricultural District as provided in the Town Plan. Motion, 22-23. As argued, then, the issue is whether approving this type of resort project in this district would conform with the town plan, although it could also be read as a question about the Bylaws' conformity with the town plan without changing our analysis.

As we have previously stated, "only those plan provisions that set forth a 'specific policy' and are 'stated in language that is clear and unqualified, and creates no ambiguity' will be regarded as regulatory instead of aspirational and can therefore be enforceable against an Applicant." Saxon Hill Corp. Sand Extraction Application, No. 42-3-11, slip op. at 12 (Vt. Super. Ct. Envtl. Div. Sep. 17, 2014) (Durkin, J.) (citing In re John A. Russell Corp., 2003 VT 93, ¶ 16, 176 Vt. 520). In other words, only if the Town Plan created a regulatory policy against allowing resorts in the Rural Agricultural District could this be a basis to deny the project. And, of course, as the Supreme Court has repeatedly affirmed, "[z]oning is properly conceived of as the partial implementation of a plan of broader scope. It must reflect the plan, but it need not be controlled by it." Kalakowski v. John A. Russell Corp., 137 Vt. 219, 225 (1979).

In one instance, the Supreme Court found that a regional plan's specific injunction against residential development on slopes of more than 20% created a clear regulatory policy. It thus affirmed denial of a permit for a proposed residential development on such slopes under Act 250 criterion 10, which requires conformity with local and regional plans. In re Green Peak Estates, 154 Vt. 363, 369 (1990). In contrast, in another case where the Town Plan stated that development was inappropriate

on the "steepest slopes" but did not define "steepest," the Court held that the Plan did not create a clear regulatory policy that could be grounds to deny an Act 250 permit. In re Kisiel, 172 Vt. 124, 129-30 (2000). In that same case, a section of the Plan "discouraging" road "upgrades" in a certain area did not evince a clear policy banning improvements to those roads. Id. at 133.

In a separate case involving an older version of the Manchester Town Plan, the Court found that language suggesting a zone accommodate uses related to the tourism industry, while warning of over-development, did not evince a clear regulatory policy against all non-tourism related commercial uses in that zone. In re Molgano, 163 Vt. 25, 29-30 (1994); see also In re John A. Russell Corp., 2003 VT 93, ¶ 19, 176 Vt. 520 (similarly finding no regulatory policy limiting uses in a rural area to residential uses, and noting that manufacturing and industrial development were not expressly excluded in that zone by the Town Plan).

Here, the Town Plan does not evince a clear and unambiguous regulatory policy against allowing resorts or similar projects in the Rural Agricultural District.[7] The passage to which Neighbors cite to support their argument reads: "[t]he Farming and Rural Residential (FRR) Zoning District, which covers a large portion of the town's land area, is intended to encourage and preserve agriculture and similar working lands uses, discourage sprawl, preserve open space, and encourage efficient provision of public services." Exh. A to Motion at 59. The language of "encourag[ing] and preserv[ing]" agriculture and other working lands and "discourag[ing] sprawl" is inherently aspirational and does not expressly exclude any types of development. See In re Molgano, 163 Vt. 25, 29-30 (1994); In re John A. Russell Corp., 2003 VT 93, ¶ 19. The section of the Town Plan that Neighbors claim the project does not conform to therefore does not establish a clear and unambiguous regulatory policy that could be the basis for ruling in their favor. Summary judgment is therefore **DENIED** as to Question 13.

> 14. *"Should the Application be denied because it proposes either a 'hotel or motel,' neither of which is a permitted or conditional use in the RA or FC district under Ordinance § 4.14?"*

The Bylaws define "hotel or motel" separately from "resort." While a resort is a conditional use in the Rural Agricultural District, "hotel or motel" are prohibited uses. *See* § 4.1.4(B) ("A use not specifically listed as permitted or conditional in a zoning district on the use table (Section 4.14) is

_____

[7] The relationship between the "Farming and Rural Residential" district referenced in town plan and the "Rural Agricultural" district defined in Ordinance, in which the project largely would fall, is not initially clear. We assume for purposes of this decision that the RA District falls within what was at one point the FRR district.

-22-

prohibited" unless one of two conditions are met) and § 4.14 ("Use Table") at p. 51. Neighbors argue that the project as proposed is best categorized as a hotel or motel and is therefore a prohibited use in the Rural Agricultural District.

A resort is defined in § 4.14 as "Use of one or more structures to provide short-term accommodations for transient guests where the primary attraction is recreational amenities or activities. It may also include accessory uses such as food services, recreational services, convention hosting, laundry services, etc." A hotel or motel is defined as "Use of one or more structures to provide short-term accommodations for travelers. It may also include accessory uses such as food services, recreational services, convention hosting, laundry services, etc." The primary difference between a resort and a hotel or motel according to the Bylaws is that the main attraction for guests of a resort is its recreational amenities or activities.

Applicant proposes a number of recreational amenities or activities at the project, including a "Recreation Activity Barn" with food and beverage facilities, and a "Hilltop Lodge" that includes spa treatment rooms. SUMF at 54. Applicant also proposes to allow guests to access an existing on-site falconry school and to make use of hiking trails on and adjacent to the property. He proposes to construct a yoga platform, a "yard game area," and a "communal firepit." Exhibit 5 to Appellants' Motion, "Narrative for C.U.P. Review." Moreover, the unusual "camp shelters" in woodland settings might themselves be viewed as a recreational amenity and a reason travelers will want to stay at the project's lodging. Neighbors, however, argue that, even taken together, these amenities and activities do not constitute a primary attraction for guests at the project. They attempt to import case-law distinguishing a primary from accessory use to argue that these recreational activities would all be considered accessory uses to the primary use of hospitality and therefore cannot be deemed the primary attraction for guests. Reply at 9.

Neighbors' argument is unpersuasive. Whether these activities would be considered accessory uses under a different section of the Bylaws is irrelevant to whether they are the primary attraction for guests staying at the project. The Bylaws assume that the main use by guests of a resort is short term accommodations, as seen in the inclusion of "resort" under the header "Lodging" in the use table and indeed in the definition of "resort." All that the Bylaws require for a use to be considered a resort is that when guests choose a resort over other forms of lodging, the primary attraction must be recreational amenities or activities. Viewing these undisputed facts in the light most favorable to the Applicant as the non-moving party, it is reasonable to conclude that such activities and amenities will

be the primary draw for guests of the project compared to other lodging, and that based on the Bylaws' plain language, this project qualifies as a resort.

Elsewhere, Neighbors argue that because Applicant and his engineers occasionally used the word "hotel" in reference to aspects of the project, Applicant has conceded that the project's use is best categorized as "hotel or motel." Applicant claims these uses of the word "hotel" are taken out of context, and in some cases are responsive to town regulations that refer only to hotels when they clearly mean all types of accommodations, such as in the parking regulations. Response to SUMF at 45-49; Bylaws Figure 9-3. Any remaining uses of the word "hotel" in his application materials were, Applicant claims, not meant to suggest that the term "hotel" was the proper use classification for the project.

"Hotel" is a general term and a term of art as used in the Bylaws. Arguably, all resorts are hotels under common usage, but not all hotels are resorts. We agree with Applicant that any references to a hotel in his application materials reflect use of the general term, and that these few references do not demonstrate that he intended for the application to be reviewed as a proposed hotel. More importantly, as already discussed, the nature, extent, and timing of activities proposed clearly support classifying the proposed use as a resort under the Bylaws. For all these reasons, we must **DENY** Neighbors' motion for summary judgment on Question 14.

> 15. *"Should the Application be denied because Resorts cannot be used to host weddings or concerts under Ordinance § 4.14?"*

In the alternative to Question 14, Neighbors argue that even if the project is best classified as a resort, the Bylaws do not permit resorts to host weddings or concerts. This legal challenge was grouped with Question 14 in Neighbors' memorandum in support of their motion. However, they did not argue why summary judgment should be granted on this legal issue.

We note first that Neighbors have not alleged in their undisputed material facts that concerts are planned at the project. Applicant denies that any stand-alone concerts are planned, although he admits that weddings are planned and may have amplified music. Memorandum in Opposition at 20. We therefore consider the question only as it relates to weddings.

Broadly speaking, proposed activities (as opposed to "uses") must either fall within the definition of the primary proposed use of land development, be permitted as [part of] an accessory use, or be so minor and private as to not trigger permitting requirements at all. Cf. All Metals Recycling, No. 171-11-11 Vtec, slip op. at 5-6 (Vt. Super. Ct. Envtl. Div. April 23, 2012) (Walsh, J.) (finding a dispute as to material facts existed as to whether certain proposed activities would fall within

-24-

the definition of permitted as opposed to a prohibited use); *see also* <u>In re Scheiber</u>, 168 Vt. 534, 538 ("Certain recreational uses of private property plainly fall outside the rudiments of zoning.").

Hosting weddings and other large events at a resort facility clearly is not a private recreational use of property. Applicant must therefore demonstrate that those activities either fall within the nature of the principal proposed use for the project or obtain permission for them as accessory uses. *See generally* Bylaws §§ 4.1.4(A)-(E), 4.14. Hosting weddings does not appear to be intrinsic to the nature of a "resort," as defined in the Bylaws, as it is not related to providing either short term accommodations or activities and amenities to guests. Bylaws § 4.14 at p.51. But we cannot foreclose that interpretation at this pre-trial phase of this appeal; we must therefore await the presentation of evidence. Applicant could also receive approval for this activity as an accessory use. To obtain a permit for an accessory use under the Bylaws, Applicant must demonstrate that the use either (a) is itself a permitted or conditional use in the district, (b) is specifically allowed as an accessory use to the proposed use, or (c) satisfies the Conditional Use criteria, regardless of whether (a) or (b) are met. Bylaws § 4.1.4(E)(2).

Applicant appears likely to meet at least one of the criteria in subsections (a)-(c). First, the DRB (or our Court sitting in its place) could find that weddings are among the accessory uses specifically authorized for a resort. Bylaws § 4.1.4(E)(2)(B). The definition of resort includes the following provision: "[A resort] may also include accessory uses such as food services, recreational services, convention hosting, laundry services, etc." While hosting weddings is not explicitly listed among those uses, the words "such as" at the beginning of the list and "etc." at the end demonstrate that this is meant to be read as an illustrative but not exhaustive list. The DRB or our Court could conclude that hosting weddings is sufficiently similar to the illustrative uses listed, specifically convention hosting and food services, as to fall within the permissive list. It admittedly may be challenging to square that interpretation with the requirement at 4.1.4(E) that the accessory use be "specifically authorized." However, the DRB or this Court could also approve hosting weddings under either of the other two pathways at § 4.1.4(E)(2). For example, "event facility" is another defined conditional use in the RA district, and weddings are among the activities explicitly allowed at an event facility. § 4.14 at p. 55. This appears to satisfy § 4.1.4(E)(2)(A). Alternatively, the Court could conceivably still approve hosting weddings as an accessory use under conditional use review, which is a fact intensive inquiry. § 4.1.4(E)(2)(C). Neighbors will also be afforded an opportunity at trial to present evidence and legal argument as to why such uses must not be allowed. However, Neighbors have not demonstrated their entitlement to relief as a matter of law at this pre-trial stage

on the question of whether hosting weddings is allowed at a resort under the Bylaws and have not provided any evidence that concerts are proposed. Their motion for summary judgment as to Question 15 is therefore **DENIED**.

## Conclusion

We wish to make one general concluding observation: At numerous points in their memorandum in support of their motion for summary judgment, Neighbors reference opinions that the Bennington County Regional Commission offered in the course of reviewing the project's Act 250 Application. We believe that reference to such statements are not appropriate in the present appeal. However, if Applicant has made any material changes to the project through their Act 250 application, such as redesigning the cabin shelters, efficient administration of justice would dictate that we review the project as currently proposed, so as to limit the need for further permit amendment applications in the future.

In summation, we partially **GRANT** Neighbors summary judgment on Question 1 of their Statement of Questions, in that the area beneath the camp shelters must be included in the lot coverage numerator. We also partially **GRANT** summary judgment on Question 11, in that Applicant must submit his specific plans for off-site parking for large events concurrent with his present application in order for approval to extend to those events. In all other respects, Neighbors' motion for summary judgment is **DENIED**.

Electronically signed on December 2, 2021, at Newfane, VT pursuant to V.R.E.F. 7(d).

_____
Thomas S. Durkin, Superior Judge
Environmental Division

-26-